Filed 3/21/14

**CERTIFIED FOR PUBLICATION**


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LESLIE FALCON et al., | D062807 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2009-00102312-CU-PO-CTL) |
| LONG BEACH GENETICS, INC. et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge. Affirmed.


Admire & Associates and Duane A. Admire for Plaintiffs and Appellants Leslie Falcon and Minor.

JoEllen Plaskett for Plaintiff and Appellant Michael Patterson.

Higgs, Fletcher & Mack, William M. Low; Ungaretti & Harris, Timothy E. Horton for Defendants and Respondents.

Plaintiffs and appellants Leslie Falcon, her minor daughter (at times collectively the Falcons) and Michael Patterson appeal from a summary judgment in favor of defendants and respondents Long Beach Genetics, Inc. (LBG), Esoterix, Inc. (Esoterix), and Laboratory Corporation of America (LabCorp) on plaintiffs' second amended complaint for negligence arising out of an erroneous deoxyribonucleic acid (DNA) test result used to determine minor's paternity. Plaintiffs advance several arguments as to why the trial court erred in granting summary judgment, but we need only decide whether the Civil Code section 47, subdivision (b) litigation privilege (the section 47(b) privilege or the litigation privilege) bars the action and whether the trial court abused its discretion by denying plaintiffs leave to amend. Because defendants' alleged conduct on which plaintiffs rely falls within the section 47(b) privilege, we conclude the trial court did not err in granting summary judgment, nor did it err by denying leave to amend the complaint. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We set out the undisputed material facts as ascertained from the parties' moving and opposing papers (see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 327) and state other facts and draw inferences from them in the light most favorable to plaintiffs. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) Having said this, we are compelled to note the difficulty we have had identifying the evidence supporting plaintiffs' claimed disputes as to defendants' enumerated material facts pertaining to the section 47(b) privilege. Plaintiffs' opposing separate statements largely contain argumentative assertions in response to each listed

2

fact, unsupported by the cited evidence.[1]  And, much of plaintiffs' evidence is directed to their assertion that LBG was not a licensed healthcare provider in the relevant time period, which is not relevant to the section 47(b) privilege issue.  In that respect, plaintiffs' opposing separate statements are of little evidentiary value.  (Cf. *Tucker Land Co. v. State of California* (2001) 94 Cal.App.4th 1191, 1201 [supplemental proffer of undisputed material facts of no evidentiary value where the facts were not supported by specific references to pages and lines in the depositions and cited exhibits].)

To further complicate review, plaintiffs make numerous factual assertions in their briefs without record citation.  Accordingly, our review of the facts is also hindered by their failure to provide citations to the record that comply with California Rules of Court, rule 8.204(a)(1)(C).  We are entitled to disregard such unsupported factual assertions even on de novo review of a summary judgment.  (See *Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 816, fn. 5 ["The claimed existence of facts that are not

---

[1]  For example, in their opposing summary judgment separate statements and opening appellate briefs, the Falcons and Patterson assert they had no knowledge of the 2003 paternity proceeding at issue in this matter and Patterson was not served with any summons or complaint.  In response to defendants' assertion that the DNA test took place within the confines of the 2003 paternity proceeding, plaintiffs assert:  "The 2003 paternity test was requested without any knowledge by the parties of said lawsuit, it was not within the confines of any litigation brought or known by the tested parties.  [San Diego County Department of Child Support Services (DCSS)] did not serve the tested party any Summons or Complaint."  Setting aside the fact that plaintiffs provide no authority for the proposition that a plaintiff must either initiate or have knowledge of pending litigation to defeat the section 47(b) litigation privilege, the evidence cited for this proposition—the declaration of LBG's general manager and laboratory director John Taddie, Ph.D., the request for dismissal of the 2003 proceeding against Patterson, and the November 2003 stipulation regarding DNA parentage test and order thereon executed by Patterson—does not support these assertions.

3

supported by citations to pages in the appellate record, or not appropriately supported by citations, cannot be considered by this court."]; *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1025.)

LBG is a laboratory that conducted DNA paternity testing until 2005, when it was acquired by LabCorp.  In the fall of 2003, Leslie Falcon and Patterson scheduled a free paternity test with the County of San Diego (County) to confirm that minor was Patterson's child.  On September 26, 2003,[2] County commenced a paternity proceeding in the San Diego County Superior Court entitled *County of San Diego v. Michael Patterson* (Super. Ct. S.D. County, 2004, No. DF177011).  In connection with that proceeding, Patterson agreed to provide a genetic specimen for testing on October 30, 2003, which would be delivered to LBG for testing.  LBG's testing location was at the superior court in downtown San Diego, and its family relationship testing was performed as part of its contractual relationship with County.  It collected DNA samples from Patterson and the Falcons in order to assist County in determining minor's paternity.

In November 2003, LBG issued test results excluding Patterson as minor's biological father and mailed it to both parents.  The test results were accompanied by a declaration of LBG custodian of records Christine D'Autremonte, certifying the records.

---

[2]  The September 26, 2003 filing date of County's proceeding is reflected in LabCorp's request for judicial notice of the court file in County's paternity action, as well as in a page from the register of actions attached as an exhibit to counsel's declaration in support of LabCorp's motion for summary judgment.  In its order granting summary judgment and judgment thereon, the trial court states that County's paternity proceeding was initiated in September 2003.

4

On January 30, 2004, County sent Patterson a letter informing him that the blood test results revealed he was not minor's father. The test results, however, were erroneous, as they were based on the DNA markers of someone other than Patterson. Leslie Falcon did not discover the error until February 2008, in connection with her application to reopen minor's paternity case.

In November 2009, the Falcons sued defendants for negligence. The judicial council form complaint alleged that defendants "negligently concluded and thereafter via declaration testimony informed the San Diego Superior Court and Plaintiffs—that through their DNA tests, which were 99.99 [percent] accurate—[minor] was not the daughter of her actual father Michael Patterson," causing damage in November 2003. The Falcons further alleged they "did not suspect, nor were they able to discover this error until the Defendant conducted further DNA tests in February 2008" and that the negligence "caused and continues to cause both economic and non-economic damages to the Plaintiffs." Patterson was added as a plaintiff in July 2010.

Defendants moved for summary judgment and alternatively summary adjudication of issues. They argued (1) plaintiffs' claims were barred by the litigation privilege; (2) defendants owed no duty to plaintiffs; and (3) the complaint was barred by the one-year statute of limitations under the Medical Injury Compensation Reform Act

5

(MICRA)[3] and thus failed to state facts sufficient to constitute a cause of action.  As to Patterson, defendants argued that even if the MICRA one-year limitations period did not apply, his claim was barred by the two-year general negligence statute of limitations.

Plaintiffs opposed the motion, filing separate but largely identical papers.  In part, plaintiffs argued the section 47(b) privilege did not apply to LBG's negligent performance of the first paternity test and defendants owed a legal duty to plaintiffs as intended third party beneficiaries of the contract between County and LBG.[4]  Neither Patterson nor Leslie Falcon submitted a declaration in support of the motion.  Instead, in their separate statements they cited evidence submitted by defendants, and later supplemented their showing with defendants' responses to requests for admissions. Plaintiffs lodged foreign authorities including *Berman v. Laboratory Corporation of America* (Okla. 2011) 268 P.3d 68 (*Berman*), in which the Oklahoma Supreme Court

---

3    "MICRA applies to any claim of professional negligence against a 'health care provider.' [Citations.]  A 'health care provider' is 'any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code . . . .' " (*de Mercado v. Superior Court* (2007) 148 Cal.App.4th 711, 714.)  Code of Civil Procedure section 340.5 provides in part:  "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."

4    Plaintiffs also argued defendants' motion should be denied due to defense counsel's "unethical misconduct" in withholding documents concerning LBG's licensed healthcare provider status and MICRA's one-year limitations period did not apply to plaintiffs' claims because LBG was not a licensed healthcare provider in 2003.  Patterson additionally argued there was a factual dispute over whether he knew or reasonably should have known about LBG's 2003 testing error.  These points are not pertinent to application of the section 47(b) privilege.

held a plaintiff's negligence claim was not barred by an Oklahoma absolute privilege for communications made during or preliminary to a judicial proceeding, and LabCorp owed that plaintiff, a parent seeking to prove her child's paternity, a duty to conduct accurate DNA testing ordered by Oklahoma's Department of Human Services for child support purposes. (*Id*. at pp. 71-72.)

At about the same time, Patterson applied ex parte to file a third amendment to the complaint to add a claim for punitive damages. He sought to allege that LabCorp had retested Falcon and Patterson's DNA in 2008 at the request of DCSS, but did not inform Falcon or Patterson until 2010, and further that LabCorp did not integrate LBG's data after its merger with LBG, which caused LabCorp's cross-referencing system to fail in 2007 to recognize the 2003 testing error. Patterson sought to allege that these failures constituted gross negligence warranting punitive damages. The trial court set a hearing on the motion for March 2, 2012.

Plaintiffs thereafter neglected to timely file their motion for leave to amend, and Patterson again sought ex parte an order shortening time to file the motion. In the amended pleading, Patterson additionally sought to challenge LBG's assertion it was a licensed health care provider for purposes of applying the MICRA statute of limitations, claiming LBG withheld evidence that proved otherwise. The trial court denied Patterson's request to shorten time and scheduled the motion for June 15, 2012, after the summary judgment hearing.

At oral argument on defendants' summary judgment motion, counsel argued extensively about the existence of litigation, the parties' knowledge of County's paternity

7

proceeding, and their motivation for going to County for blood testing. The court asked counsel to focus on the connection between the DNA test and County's proceeding, and Patterson's counsel represented that the paternity test was a free service offered by County performed without any reference to Medi-Cal or any paternity action. When pressed, however, to identify the record evidence of that assertion, counsel could not, and eventually offered to supplement her showing with materials from DCSS. The Falcons' counsel asked the court to allow them to amend the complaint "to represent the facts, that the negligent gravamen of this, or the gravamen is the negligent conduct, not the noncommunicative conduct [*sic*]." Plaintiffs also sought to amend the complaint to allege that defendants had conducted a retest in 2007 but did not inform Patterson until 2010, breaching its contract with County and violating Family Code section 7552.

Ruling *Berman*, *supra*, 268 P.3d 68 was directly at odds with California authority, specifically *Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491 and *Gootee v. Lightner* (1990) 224 Cal.App.3d 587, the trial court granted summary judgment in defendants' favor. Taking judicial notice of the existence of County's proceeding, the court ruled the gravamen of plaintiffs' complaint was communicative conduct barred by the section 47(b) privilege; that LBG performed the test in connection with the paternity proceedings initiated by County and plaintiffs' alleged injuries arose from the laboratory's communication of the test results to the parties in that action. The court denied plaintiffs' request for leave to amend the complaint to allege that LBG breached its duty to notify plaintiffs of its 2008 retest results under Family Code section 7552.5 and the contract between it and County. It reasoned that the amendment was unreasonably delayed, as the

8

Falcons had filed the action in November 2009 and Patterson was added in July 2010, but the request to amend was not made until the April 2012 summary judgment hearing. It further ruled plaintiffs could not state a viable cause of action in any event.[5] Plaintiffs appeal from the ensuing judgment.

## DISCUSSION

### I. *Summary Judgment Principles and Standard of Review*

"Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Aguilar*, *supra*, 25 Cal.4th at p. 850; Code Civ. Proc., § 437c, subd. (p)(2).) Such a defendant bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact. (*Aguilar*, at p. 850.) Once the

---

5      The judgment states: "Family Code section 7552.5 requires the County to serve on all parties a 'copy of the results of all genetic tests performed under Section 7552 or 7558 . . . no later than 20 days prior to any hearing in which the genetic test results may be admitted into evidence.' As an initial matter, plaintiffs do not identify any hearing that triggered the duty to serve LabCorp's revised conclusion. In addition, the statute imposes the duty to serve on the County. The County hired LBG/LabCorp to provide services in connection with paternity litigation and to assist the court in rendering a judgment in the matter. LabCorp's contractual assumption of the County's obligation under section 7552.5 does not create a duty of care on the part of LabCorp to plaintiffs. (Cf. *Felton v. Schaeffer* (1991) 229 Cal.App.3d 229.) Likewise, the fact that LabCorp may have contractually agreed to perform the County's obligation to serve plaintiffs with test results does not tend to establish they were intended third party beneficiaries."

9

defendant meets its initial burden of production, the burden shifts to plaintiff to demonstrate the existence of a triable issue of material fact. (*Id.* at pp. 850-851.)

On appeal, we review the record and the trial court's decision de novo, liberally construing the evidence in support of the plaintiffs as the opposing parties and resolving doubts concerning the evidence in their favor. (*Coral Const., Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336; *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017.) Despite this review in plaintiffs' favor, "plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

## II. *The Section 47(b) Privilege Bars Plaintiffs' Negligence Claim*

### A. *The Section 47(b) Privilege*

The section 47(b) litigation privilege "provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.) " 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the

10

action.' "  [Citation.]  The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' "  (*Action Apartment*, at p. 1241, quoting *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212; see also *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 282; *Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 336 [communications with some relation to an anticipated lawsuit are within the privilege].)  And judicial or quasi-judicial proceedings are " 'defined broadly to include "all kinds of truth-seeking proceedings," including administrative, legislative and other official proceedings.' "  (*Wang v. Heck* (2012) 203 Cal.App.4th 677, 684.)  "[T]he communication must be ' "in furtherance of the objects" ' of the proceeding, which is ' "part of the requirement that the communication be connected with, or have some logical relation to, the [proceeding], i.e., that it not be extraneous to the [proceeding]." ' "  (*Hawran*, at pp. 282-283, quoting *Action Apartment*, at p. 1251.)

The litigation privilege is absolute and broadly applied regardless of malice. (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955.)  Its purposes are to " 'afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments and to avoid unending litigation.' "  (*Ibid*.)  It promotes effective judicial proceedings by encouraging full communication with the courts.  (*Ibid*.)  Accordingly, doubts as to whether the privilege applies are resolved in its favor.  (*Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 283; *Wang v. Heck*, *supra*, 203 Cal.App.4th at p. 684.)

11

Despite its broad and absolute nature, the litigation privilege only protects publications and communications. Thus, "a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative. . . . The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. . . . That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057-1058; see also *Action Apartment Assn., Inc. v. City of Santa Monica*, *supra*, 41 Cal.4th at pp. 1248-1249.) And, if the gravamen of the action is based on a communicative act, "the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct . . . . Stated another way, unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action, the litigation privilege applies." (*Rusheen*, at p. 1065; *Tom Jones Enterprises, Ltd. v. County of Los Angeles* (2013) 212 Cal.App.4th 1283, 1295.) The interpretation of Civil Code section 47, subdivision (b) is a pure question of law that we review independently. (*Wang v. Heck*, *supra*, 203 Cal.App.4th at p. 684.)

B. *Challenges to the Elements of the Section 47(b) Privilege*

Patterson contends these facts do not meet the elements of the section 47(b) privilege, that is, the existence of an underlying judicial or quasi-judicial proceeding, or the necessary communication made by litigants or other participants authorized by law, to achieve the objects of the litigation, having some connection or logical relation to the action. (See *Action Apartment Assn., Inc. v. City of Santa Monica*, *supra*, 41 Cal.4th at p.

12

1241.)  Specifically, Patterson maintains there is no evidence of any dispute, or that a "true case with appropriate pleadings were [*sic*] filed prior to testing," and there is no evidence he and Falcon had initiated the case or were participating in litigation.  He suggests plaintiffs did not need to engage in a paternity fight because they were both "engaged and happy" custodial parents, and the DNA test had no connection or logical relation to the action because he was not refusing to support his child.

Falcon includes similar arguments in her reply brief on appeal.  In part, relying on *County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, a case not involving the section 47(b) privilege, she argues service of summons and complaint of County's action was a prerequisite to any determination that plaintiffs were litigants in that action, and there was no personal jurisdiction over the parties, violating their rights to due process.  She also argues the plaintiffs underwent testing of their own "free will" and did not respond to any court order or ask to be involved in any litigation.

These contentions are meritless.  The trial court properly took judicial notice of the existence and pendency of County's superior court proceeding against Patterson (Evid. Code, § 452, subd. (d) [judicial notice proper of records of "any court of record of . . . any state of the United States"]; *People v. Lee* (2011) 51 Cal.4th 620, 651, fn. 20), and there is no dispute Patterson consented to the defendants' DNA testing.  As we explain below, Patterson's stipulation constituted a general appearance in the action, conferring jurisdiction over his person.  DNA testing was sought to assist County in the then pending proceeding to ascertain minor's paternity; defendants' acts in conducting the test and communicating its results plainly furthered that goal, and had some logical relation to

13

the action.  (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1241.)  None of the authorities relied upon by Patterson and the Falcons support the proposition that application of the section 47(b) privilege requires a party or participant initiate or be cognizant of pending or contemplated litigation.  More specific to this case, plaintiffs' arguments give us no basis to conclude a party's willingness to undergo DNA testing, where that testing is performed under contract with a County for purposes of a pending paternity proceeding, somehow negates any connection or logical relation between the test and the paternity action.[6]

---

[6]     At oral argument, the appellants repeated an argument raised for the first time in Patterson's reply brief: that LabCorp cannot meet the third and fourth prongs of the litigation privilege because its negligence was in testing the DNA of an unknown man. They contend that as a result, LabCorp's report of test results, even if a communication made in connection with litigation, neither was made "to achieve the objects of the litigation" nor has any "connection or logical relation" to the action.  (See *Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1241; *Silberg v. Anderson, supra*, 50 Cal.3d at p. 212; see also *Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1057 [communications with " 'some relation' " to judicial proceedings are absolutely immune from tort liability].)  This argument, if accepted, would make application of the litigation privilege turn not on the connection between the communication and the litigation but on the type or nature of the underlying negligence.  We decline to adopt such an unworkable test, which would contradict the law in California that the litigation privilege is to be construed broadly to " 'afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions' " (*Action Apartment*, at p. 1241) and that doubts are to be resolved in favor of applying the privilege.  (*Hawran v. Hixson, supra*, 209 Cal.App.4th at p. 283.)  LabCorp's DNA testing and communication of results, regardless of the nature of LabCorp's error, was done for the purpose of determining the minor's paternity in connection with County's proceeding, and thus was in furtherance of the objects of, and had some functional relation to, that proceeding.  (*Action Apartment*, at p. 1251 [communication must be " 'in furtherance of the objects of the proceeding' " and not be extraneous to it]; *Rusheen v. Cohen*, at p. 1057; *Hawran v. Hixson*, at pp. 282-283 [connection or logical relation for the section 47b privilege must be a functional connection; a necessary or useful step in the litigation process].)

14

C. *Plaintiffs Allege Their Injury Resulted from the Defendant's Communication of the Erroneous Test Results to County*

Characterizing the trial court's decision as inequitable, illogical, and contrary to the Legislature's intent in enacting Civil Code section 47, subdivision (b), plaintiffs contend the litigation privilege cannot apply to a free paternity test conducted negligently merely because the erroneous test results were communicated to County and the parties. They argue: "The litigation privilege was intended to protect expert witnesses from being sued for their opinions, for the testimony they offer in court. But DNA paternity testing is mathematical, a test akin to throwing a switch and comparing two printed documents to determine if the marks on the two documents are identical." Plaintiffs assert the entire purpose of defendants' paternity test is to provide the court and the parents definitive proof of a child's father, and thus the distinction between the performance of the test itself and the inevitable communication of its results becomes "meaningless," and would leave parties harmed by a negligently performed test without any legal remedy.

As stated above, plaintiffs squarely allege the basis for negligence liability is that defendants "negligently concluded *and thereafter via declaration testimony informed the San Diego Superior Court and Plaintiffs . . . through their DNA tests . . . [that minor] was not the daughter of her actual father Michael Patterson . . . .*" (Italics added.) Plaintiffs allege that this negligence caused damage in November 2003. Plaintiffs' allegations demonstrate their injuries "resulted from an act that was communicative in its essential nature." (*Rusheen v. Cohen*, *supra*, 37 Cal.4th at pp. 1057-1058.) Accordingly, the litigation privilege extends not only to the defendants' communication of the genetic test

15

results, but the noncommunicative act of the DNA testing itself that is necessarily related to the communication.  (*Id*. at p. 1065.)

Under settled summary judgment standards, we are limited to assessing those theories alleged in the plaintiffs' pleadings.  (*Conroy v. Regents of University of Cal.* (2009) 45 Cal.4th 1244, 1250 [the materiality of a disputed fact is measured by the pleadings, which set the boundaries of the issues to be resolved at summary judgment]; *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th at 292, 332; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253-1258 & fn. 7; *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648.)  " 'The burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint.*  A "moving party need not '. . . refute liability on some theoretical possibility not included in the pleadings.'  [Citation.]"  . . . " '[A] motion for summary judgment must be directed to the *issues raised by the pleadings.*  The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings.' " ' "  (*County of Santa Clara*, at p. 332.)  " 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' "  (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381.)  "[A] plaintiff wishing 'to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing."

16

(*Oakland Raiders*, at p. 648; see also *County of Santa Clara*, at p. 333; *Laabs. v. City of Victorville*, at p. 1257.)

Even if plaintiffs had specifically alleged that the basis for their claim was defendants' negligent testing, and not the communication of the test results via D'Autremonte's declaration, our conclusion would not change. The summary judgment evidence is undisputed that the test results were communicated to County and the parties for the purpose of County's paternity proceeding. Thus, defendants' testing and its communication to County are necessarily linked, and the injury would not have occurred but for communication of the results in the legal proceeding.

We are not convinced by plaintiffs' arguments otherwise. The distinction between an expert's opinion testimony, which plaintiffs assert is subject to the privilege, and underlying negligently performed scientific testing, which assertedly should fall outside the privilege, is simply not recognized by California authorities applying the section 47(b) privilege in analogous contexts. For example, in *Block v. Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, the Court of Appeal held the litigation privilege applied to an action for professional negligence against a toxicologist for a negligently performed blood analysis provided to the district attorney to determine whether criminal charges were warranted. (*Id*. at pp. 387-388.) The toxicologist had erred in his calculations of the amount of baby aspirin a baby would have ingested based on the salicylate concentration in its blood. (*Id*. at p. 388.) The plaintiff argued the toxicologist was liable if his lack of ordinary care caused foreseeable injury to her economic interests: " '[O]nce [the defendant] had made his erroneous preliminary determination that the child

17

had ingested a large number of aspirins immediately prior to her death, his *purpose* was to provide that information to the District Attorney and to the court *so that they would rely thereon*.' " (*Id*. at p. 392.) The plaintiff argued there was "no question" her injuries were "clearly foreseeable and in fact foreseen" by the defendant. (*Ibid*.)

The Court of Appeal held this theory "place[d] [the defendant's] communication of the report to the district attorney and, later, his testimony in the criminal proceeding, at the heart of the claim of liability. . . . Whether the matter be characterized as the publication of a negligently prepared report or the negligent publication of the report, plaintiff finds the *duty* upon which her theory of negligence relies in the foreseeable consequences of *publication* of the report in or related to the judicial proceeding." (*Block v. Sacramento Clinical Labs, Inc.*, *supra*, 131 Cal.App.3d at pp. 392-393.) Any other approach would "substantially defeat the purpose of [the] privilege." (*Id*. at p. 394.) The court observed that the plaintiff at oral argument sought to escape the privilege by characterizing the action as arising out of the defendant's negligent *conduct* alone. (*Id*. at p. 393, fn. 10.) It concluded, however, that under any cognizable theory of duty, "the negligent calculation formed the basis of [defendant's] communication and was privileged." (*Ibid*.) *Block* held the defendant toxicologist's conduct fell within the litigation privilege; he performed and communicated the calculations on the request of the district attorney in furtherance of its investigation whether there was probable cause to initiate criminal charges relating to the infant's death, and thus the conduct had some relation to proposed and seriously considered criminal litigation. (*Id*. at pp. 393-394.)

18

More recently, in *Wang v. Heck*, *supra*, 203 Cal.App.4th 677, the appellate court affirmed a summary judgment on grounds the section 47(b) privilege barred a plaintiff motorist's negligence claim against a neurologist who had filled out a medical evaluation form for a patient that was relied upon by the Department of Motor Vehicles (DMV) to reinstate the patient's license. (*Id*. at pp. 679, 681.) Like plaintiffs in the present case, the plaintiff in *Wang* sought to avoid the privilege's application by arguing the negligence was not the completion of the DMV medical evaluation form, but the neurologist's treatment of the patient before that time and her failure to warn the patient not to drive. (*Id*. at pp. 685, 686.) The Court of Appeal rejected that argument. It reasoned none of the plaintiff's causes of action could stand without relying on the neurologist's completion of the DMV medical evaluation form. (*Id*. at p. 684.) It pointed out that the neurologist was a participant authorized by law to complete the form, and "[a]lthough [the neurologist] did not complete the DMV evaluation form for purposes of testifying in judicial proceedings," the form was used in a " ' "truth-seeking proceeding[,]" ' " that is, it was used in the DMV administrative hearing in order for the DMV hearing officer to determine whether to reinstate the patient's license. (*Id*. at p. 685.) Further, the form was completed to achieve the object of the DMV hearing: to determine the patient's fitness for driving. (*Ibid*.) The court stated: "[I]t is clear that [the neurologist's] conduct prior to completing the . . . DMV evaluation form was the basis of her communication in completing the form. Although appellants attempt to characterize their claim as medical negligence by failing to warn [the patient] not to drive, the basis of their complaint is [the neurologist's] statement on the DMV medical evaluation form that [the patient] could

19

drive safely." (*Id*. at p. 686.)  In concluding the gravamen of the plaintiff's action was communicative, the *Wang* court's focus was not on the neurologist's testimonial function at a judicial proceeding, but the use of the neurologist's report in connection with that proceeding.  As the court in *Wang* recognized (*id*. at pp. 686-687), our high court emphasizes the importance of the litigation privilege's absolute protection of access to the courts, even despite its costs:  " ' "[It] is desirable to create an absolute privilege . . . not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with [subsequent derivative] actions . . . ." ' [Citations.]  ' "[W]hen there is a good faith intention to bring a suit, even malicious publications 'are protected as part of the price paid for affording litigants the utmost freedom of access to the courts.' " ' "  (*Action Apartment Assn., Inc. v. City of Santa Monica*, *supra*, 41 Cal.4th at p. 1244.)

Here, as in the above cases, the defendants' DNA test was prepared for the purpose of determining minor's paternity in connection with County's paternity proceeding, and transmitted to and used by County for that purpose.  This result does not, as plaintiffs argue, "afford[ ] absolute immunity to DNA paternity testers . . . ."  (Some capitalization omitted.)  It protects only those persons or entities conducting tests in connection with or contemplation of litigation within the meaning of the section 47(b) litigation privilege, a result compelled by the breadth of the privilege and its purposes.  In reaching our

20

conclusion, we necessarily decline plaintiffs' invitation to adopt the reasoning of the Oklahoma Supreme Court in *Berman*, *supra*, 268 P.3d 68.[7]

Because the conduct relied upon by plaintiffs falls within the section 47(b) litigation privilege, we need not address plaintiffs' arguments concerning whether defendants owed them a duty of care.

### III. *Patterson's Due Process Argument*

Patterson contends he and Falcon were denied their federal due process rights under the Fourteenth Amendment of the U.S. Constitution because they were never served with the summons and complaint pertaining to County's paternity proceeding, and were never apprised of the pendency of the action. This argument fails for several reasons.

---

[7] The Oklahoma Supreme Court's discussion in *Berman*, *supra*, 268 P.3d 68, makes clear that the parameters of Oklahoma's statutory absolute privilege to communications made during or preliminary to a proposed proceeding (12 O.S. 2001 §1443.1), are different from California's section 47(b) privilege, which applies to all torts except malicious prosecution. (*Action Apartment Assn., Inc. v. City of Santa Monica*, *supra*, 41 Cal.4th at pp. 1241-1242). The Oklahoma privilege bars *defamation* actions, and had been extended to claims for intentional infliction of emotional distress *when based on the same factual allegations as the defamation claim*. (*Berman*, 268 P.3d at p. 71.) The Oklahoma Supreme Court pointed out that the case at hand did not involve a claim for defamation, and further, that the plaintiff's claims were not based on evidence relevant to the paternity and DNA sample of the alleged father, but on evidence that LabCorp tested the DNA of a completely different man, thus "the communication was based on the evidence of a stranger to this case." (*Ibid.*) The court concluded the negligence claim arose not out of the laboratory's communication to the Oklahoma Department of Human Services, but out of its conduct in the performance of its duties. (*Id.* at pp. 71-72.) Observing that the "importance of reliable and accurate DNA test results cannot be overstated," the Oklahoma Supreme Court went on to hold, as a matter of first impression, that LabCorp owed a duty to the plaintiff to perform accurate DNA testing for purposes of determining the paternity of her child. (*Id.* at p. 72.)

21

First, such a theory was not pleaded in the operative complaint. The sole cause of action in plaintiffs' second amended complaint is general negligence, and thus under the above-summarized summary judgment standards, we are limited to assessing that claim. Plaintiffs did not allege a cause of action for violation of any federal civil rights, which would rest on an entirely "different theor[y] of recovery" (*Laabs v. City of Victorville*, *supra*, 163 Cal.App.4th at p. 1257) and is not fairly encompassed in the second amended complaint. As a consequence, Patterson's due process arguments do not raise triable issues of material fact for a jury on plaintiffs' negligence cause of action.

Second, plaintiffs do not provide record citations to support the assertions made in their opening appellate briefs concerning service of any summons and complaint or their lack of knowledge of County's pending paternity proceeding.[8] Third, plaintiffs' opposing summary judgment evidence cited in the trial court—namely, the declaration of LBG's general manager and laboratory director John Taddie, Ph.D., the request for dismissal of

---

[8]    The Falcons argue: "Unbeknownst to appellants at the time they accessed the free paternity test, due to utilizing Medi-Cal for the birthing costs of minor appellant . . . , the County Welfare Department automatically notified, which in turn prompted, the County Department of Child Support Services . . . to initiate a support case for [minor]. This action was done electronically without notice to Falcon or Patterson; neither party knew of or expected any DCSS action to be filed. Neither Falcon nor Patterson initiated any type of case, nor was either party served a Summons or Complaint prior to requesting the free test. Moreover, neither party had any knowledge or notice of any pending case or proceeding prior to accessing the free paternity test from the county. There was no 'achieving the objects of the litigation' as they had no intent to litigate and was [*sic*] not even aware any litigation existed. There was no purpose or intent to litigate for child support." Patterson makes a largely identical argument. Neither paragraph contains any citation to the record.

22

County's 2003 proceeding, and Patterson's stipulation regarding DNA parentage test and order thereon—do not provide evidentiary support for plaintiffs' factual statements.

Finally, the summary judgment record establishes that on October 30, 2003, Patterson executed a stipulation to undergo DNA testing, which was filed in County's proceeding on November 5, 2003. While a court must have personal jurisdiction over parties (see *County of San Diego v. Gorham*, *supra*, 186 Cal.App.4th at pp. 1226-1227), it is long settled that a party's consent is a proper basis to confer personal jurisdiction over the party. (See *In re Vanessa Q.* (2010) 187 Cal.App.4th 128, 135.) In short, Patterson's execution of the stipulation constituted a general appearance in the matter, which operated as a consent to jurisdiction of his person. (See Code Civ. Proc., § 410.50, subd. (a); e.g., *City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 679 [general appearance occurs when the defendant takes part in the action or in some manner recognizes the authority of the court to proceed]; *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 52 [same].) Any of these grounds compels us to reject Patterson's due process argument.

## IV. *Leave to Amend*

The Falcons contend that even if the section 47(b) privilege applies, the trial court reversibly erred by denying their oral motion for leave to amend during the summary judgment hearing. They maintain plaintiffs had timely sought leave to amend in 2011 and 2012 to allege additional claims "stemming from the respondent's subsequent cover up of its negligence." Patterson similarly claims plaintiffs sought leave to amend in January 2012 to include allegations of negligent acts occurring in 2007 and 2008 that

23

delayed Patterson's 2010 discovery that minor was his daughter. Plaintiffs argue they made every possible effort to timely amend the complaint, and did not unreasonably delay in requesting leave to amend.

A. *Legal Principles*

A trial court has wide discretion to allow the amendment of pleadings, and generally courts will liberally allow amendments at any stage of the proceeding. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.) On a motion for summary judgment " '[w]here the complaint is challenged and the facts indicate that a plaintiff has a good cause of action which is imperfectly pleaded, the trial court should give the plaintiff an opportunity to amend.' " (*Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1773.) But if the proposed amendment fails to state a cause of action, it is proper to deny leave to amend. (*Oakland Raiders v. National Football League*, *supra*, 131 Cal.App.4th at p. 652.)

Further, unwarranted delay in seeking leave to amend may be considered by the trial court when ruling on a motion for leave to amend (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746), and appellate courts are less likely to find an abuse of discretion where, for example, the proposed amendment is " 'offered after long unexplained delay . . . or where there is a lack of diligence . . . .' " (*Hulsey v. Koehler* (1990) 218 Cal.App.3d 1150, 1159.) Thus, when a plaintiff seeks leave to amend his or her complaint only after the defendant has mounted a summary judgment motion directed at the allegations of the unamended complaint, even though the plaintiff has been aware of the facts upon which the amendment is based, "[i]t would be patently unfair to allow

24

plaintiffs to defeat [the] summary judgment motion by allowing them to present a 'moving target' unbounded by the pleadings." (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 176; but see *Laabs v. City of Victorville*, *supra*, 163 Cal.App.4th at p. 1257, fn. 6 [if at the hearing of a summary judgment motion a party finds his pleading inadequate, the court may and should permit him to amend].)

And, under the sham pleading doctrine, the trial court may disregard amendments that omit harmful allegations in the original complaint or add allegations inconsistent with it. (*State of California ex rel. Metz v. CCC Information Systems, Inc.* (2007) 149 Cal.App.4th 402, 412; *Oakland Raiders v. National Football League*, *supra*, 131 Cal.App.4th at pp. 652-652 [applying sham pleading doctrine to request for leave to amend in summary judgment context].)

B. *Plaintiffs Have Not Demonstrated the Trial Court Abused its Discretion in Denying Leave to Amend*

Plaintiffs have not shown the trial court manifestly abused its discretion in denying them leave to amend. They argue they timely sought to allege "specific further negligent acts" on LabCorp's part in 2007 and 2008 to support an additional claim for negligence or "further gross negligence." These acts, which plaintiffs do not further describe in their opening briefs, presumably are defendants' asserted failure to send the parties copies of the test results from additional DNA testing conducted in 2008. But the trial court's decision was not limited to unreasonable delay and plaintiffs do not address the remainder of the court's ruling, which addressed the requirements of Family Code section

25

7552.5[9] and the existence of a legal duty of care to notify the parties of the additional test results (see footnote 5, *ante*).  Absent such an analysis, plaintiffs have not shown to this court, as they must (*Dey v. Continental Central Credit* (2008) 170 Cal.App.4th 721, 731), that the court abused its discretion—made a ruling that exceeds the bounds of reason or is legally incorrect (*ibid.*)—in concluding plaintiffs could not state a viable cause of action for negligence.

Nor do plaintiffs explain on appeal how their new theory—that they suffered damage by the lack of knowledge of the 2008 DNA testing—is consistent with the complaint's allegations that plaintiffs "did not suspect, nor were they able to discover this error until the Defendant conducted further DNA tests in February 2008" or their admissions in their summary judgment papers that Leslie Falcon discovered the error in February 2008, and Patterson was served with another lawsuit relating to minor's paternity in or around April or May 2008.  Plaintiffs "may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading," and "must explain inconsistencies between the prior and proposed pleading." (*Oakland Raiders v. National Football League*, *supra*, 131 Cal.App.4th at

---

[9]    Family Code section 7552.5 provides in part:  "A copy of the results of all genetic tests performed under Section 7552 [genetic tests performed by approved laboratory] or 7558 [local child support agency administrative order for genetic testing] shall be served upon all parties, by any method of service authorized under Chapter 5 (commencing with Section 1010) of Title 14 of Part 2 of the Code of Civil Procedure except personal service, no later than 20 days prior to any hearing in which the genetic test results may be admitted into evidence."  (Fam. Code, § 7552.5, subd. (a).)

p. 653; see also *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946.)  The trial court could reasonably conclude that any amendment was inconsistent with plaintiffs' theory of the case, and reject it on that basis.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.