Filed 7/11/23 Certified for Publication 7/20/23 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | D081568 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15072) |
| v. | |
| Miguel D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner. Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Miguel D. (Father) left his eight-year-old daughter, M.D., alone inside a locked apartment that had no electricity, an empty non-operable refrigerator, and no edible food. Trash, dog feces, electrical cords and power tools were strewn throughout the home. After waking up to find her father and his truck gone, M.D. climbed through a kitchen window to look for him and was found wandering the apartment complex. The San Diego County Health and Human Services Agency (Agency), which had responded to previous reports of Father's neglect of M.D. since she was two years old, filed a dependency petition alleging Father failed to adequately supervise and protect M.D., and willfully or negligently failed to provide her with adequate food and shelter. The juvenile court found the petition true, took jurisdiction, and removed M.D. from Father's custody while he was offered reunification services.

On appeal, Father asserts we must reverse the juvenile court's jurisdictional order because Welfare and Institutions Code[1] section 300, subdivision (b)(2), prohibits the juvenile court from assuming jurisdiction over a child "solely" due to a parent's indigence or poverty. He further asserts we must reverse the dispositional order because the Agency failed to demonstrate there were no reasonable means to protect M.D. without removing her from Father's custody. Because the record does not support either contention, we affirm.

---

1      All further undesignated statutory references are to the Welfare and Institutions Code.

2

*Circumstances Leading to the Current Dependency Petition*

M.D. lived with Father.  He had been raising her as a single parent as a result of a prior dependency case filed in June 2015, in which the mother[2] was found to have inflicted significant facial injuries to M.D. when she was nine months old.  Father was awarded sole legal and physical custody of M.D. when the juvenile court terminated jurisdiction in September 2015.[3]  During the dependency case, and the subsequent voluntary case that was opened to monitor Father and M.D., Father received individual therapy, in-home parenting education, and family maintenance services.  The voluntary case was closed in February 2016 when Father completed services.  But in the years that followed, the Agency continued to respond to concerns about M.D.'s welfare.

In May 2017, when she was two years old, Father left M.D. alone in a "hot" car, with the engine and air conditioning running, while he went inside a store for more than an hour.  A store employee found M.D. out of her car seat and a car door unlocked.  Responding police officers observed "numerous tools and auto parts, several of them sharp and rusty" in the car's passenger compartment.  After Father was arrested, a social worker took M.D. to Polinsky Children's Center (Polinsky) where she was later released to a paternal aunt.  Less than a year later, in March 2018, law enforcement found Father in a stalled vehicle holding a "meth pipe" and "a torch lighter," while

---

[2]    M.D.'s mother is not a party to this appeal.

[3]    A three-year criminal protective order was issued to prohibit the mother from having any contact with Father or M.D.

M.D. was jumping up and down in the backseat. She again was taken to Polinsky when Father was arrested, and subsequently released to him pursuant to a safety plan.

In July 2018, the Agency investigated concerns that neighbors saw M.D. unsupervised, hungry and dirty; the referral was closed as "[u]nfounded" when the social worker observed M.D. to be clean and food was available in the home. In March 2022, the Agency received a report that M.D. climbed out of the apartment window when Father left her home alone while he was at work; this referral was closed as "[i]nconclusive" because the Agency was "unable to locate the family."[4]

Seven months later, on October 5, 2022, police officers responded to a call for a welfare check on eight-year-old M.D. "roaming around outside without supervision." The officers found M.D. "unkempt" and in the middle of the apartment complex. When they walked her back to her apartment, the front door was locked and nobody was home. M.D. then grabbed a step stool she kept near the front door, placed it at the kitchen window, climbed inside through the window, and unlocked the front door for the officers.

Upon entering the apartment, the officers were met with "a foul stench" of rotten trash and mold. There was no electricity because Father had not paid the bills and "[t]he floor was littered with extension cords," some of which were used to illegally "tap[ ] into a neighbor's electricity" through the attic. The refrigerator was not working and "completely empty." The kitchen cupboards contained some pantry foods (such as jars of pasta sauce, cans of

---

[4] The Agency reported that it had been unsuccessful in contacting Father during previous investigations because the apartment complex is gated and Father had not responded to the Agency's letters and telephone calls, and he refused to meet with the Agency.

peas, pancake mix, instant mashed potatoes, hamburger helper, and boxed rice) but required additional ingredients to be cooked or edible. "[H]ordes of trash, junk and power tools [were] strewn throughout the apartment" and the back patio floor was covered with trash and dog feces. A stolen catalytic converter and California commercial license plate were also found in the home. It was determined that M.D. slept on the bottom of a bunk bed located in the middle of the living room near the back patio that also contained piles of clothing and "vacuums," while the top bunk was "completely covered with items nearly reaching the ceiling." "The odor from the dog feces was extremely strong from the bunk bed where [M.D.] sle[pt]."

M.D. told the officers that Father gave her a "gas station pizza" the previous night and told her to go to sleep. When she woke up on the morning of October 5, 2022, Father was gone. She climbed out the kitchen window to look for him and found his truck was also gone. M.D. was taken into protective custody. The assigned social worker tried calling Father multiple times at 5:00 p.m. that day, nearly five hours after officers found M.D. alone, but was unable to locate him. Her voicemail and text messages also went unanswered until the next day.

When the social worker interviewed M.D she said she was in the second grade and had only been "home schooled because 'it costs a lot of money' to go to school." When the social worker asked about food in the home, M.D. said, " 'Sometimes I am hungry so I drink water and that makes me full.' " She was asked about what kind of food was in the home and she responded, " 'just water bottles, that's all.' " M.D. said Father leaves her alone for " '10 hours,

not that long' "[5] and " 'goes to donate blood [to get money], goes to the casino, [and] goes to the store.' " She explained Father " 'goes to Pala and San Diego casinos and all casinos. He likes all of them.' " She said no one checks on her when Father goes to the casino, but explained, " 'My dog checks on me.' " If Father leaves her alone overnight and she is hungry when she wakes up in the morning, she drinks water. If she gets "really hungry" and " 'can't wait for [her] dad anymore,' " she will go to her neighbor who gives her food.

The next morning on October 6, 2022, Father returned the social worker's calls and later met her in person the same day. He stated he was at the junkyard on October 5 getting something for "a customer" and he was not gone for long and thought his neighbor, Margarita O., was "going to help him" with M.D. He denied leaving M.D. home alone, or that there was a lack of supervision or a risk of danger to M.D. because she had a dog that " 'protects her.' " When confronted with M.D.'s statements that contradicted his, Father claimed she does not tell the truth and "makes up stories as she is [eight] years old." The social worker found Father "was unable to comprehend" why leaving M.D. alone was unsafe. Instead, he "adamantly denied his daughter was in any danger because the dog was there to 'protect her.' "

Father explained they did not have electricity because someone " 'hacked' " into his account and turned off the electricity, but he was "trying to get it turned back on." There was no food in the refrigerator because they had been without electricity for one week, but he and M.D. " 'eat out every night' once a day and in between they eat snacks and ramen noodles." Father

---

[5]    The social worker observed that M.D. "did not have a concept of time" throughout her interview.

stated M.D. attends school online at "Education.com" but she does not have a "set teacher" and he could not provide a contact to confirm her attendance.

The apartment manager informed the Agency that Father is "very far behind in rent, at least 8 or 9 months" and "is under eviction." The manager explained, " 'There is no power in the place and [Father] was stealing power from the neighbor, which [wa]s a fire hazard.' " When there was a leak in the apartment, Father would not let anyone in to fix it. The manager had received reports from other tenants in the complex that the child was seen " 'roaming around' at 10 or 11 at night."

Margarita, the neighbor, told the social worker that Father and M.D. had lived at the apartment complex for a long time. M.D. does not go to school and was left alone in the apartment " 'all day.' " When M.D. was about three years old, she started leaving the apartment through the front door while Father was asleep. Margarita noted Father would leave the apartment "at 9:00 p.m. to do things at night" and would return in the morning and sleep during the day. In May or June 2022, Father left M.D. alone for three consecutive days so Margarita took care of M.D. Whenever M.D. came knocking on her door, Margarita would bathe her and change her clothes because she had " 'bad hygiene,' " and cook her a meal because Father only had "water and snacks" in the apartment. Margarita has offered to help Father with M.D.—including by taking her to school or church, or assisting with her "basic needs"—but Father "does not accept the help."

## II.

### *Dependency Petition and Detention*

On October 7, 2022, the Agency filed a petition on M.D.'s behalf alleging two counts of failure to protect pursuant to section 300, subdivision (b). In count 1, the Agency alleged M.D. had suffered or there

7

was a substantial risk that she will suffer serious physical harm or illness as a result of Father's failure or inability to adequately supervise or protect her. (§ 300, subd. (b)(1)(C).)

At the detention hearing in October 2022, the juvenile court made a prima facie finding on the petition, detained M.D. in out-of-home care, and granted Father liberal supervised visitation. The court also ordered family voluntary services for Father, which included parenting classes and counseling for Father and therapy for M.D. It also referred Father to a substance abuse specialist for evaluation.[6]

III.

*Jurisdiction and Disposition*

The contested jurisdictional and dispositional hearing was held in January 2023. Without objection, the juvenile court received into evidence, the Agency's detention report (summarized in Section II, *ante*), the jurisdiction and disposition report, and various addendum reports.[7] Counsel for Father elected to not cross-examine the social worker who was available at the hearing. Father testified on his behalf.

A. *Additional Information from the Agency's Reports*

1. *M.D.'s Progress*

M.D. had been placed in the home of a nonrelative caregiver since October 5, 2022. When she arrived the first night, M.D. tried to leave the

---

[6] The Agency had concerns that Father may be using a controlled substance based on his "extensive history regarding substances" and his recent June 2022 arrest for possession of methamphetamine.

[7] In their briefings on appeal, both the Agency and Father relied on a December 16, 2022 addendum report which does not appear to have been offered into evidence at the jurisdictional and dispositional hearing. The

8

home through the bedroom window. The caregiver reported she needed to teach M.D. how to take a shower and brush her teeth "step-by-step." M.D. needed "extensive" dental care, including fillings for cavities and three extractions. M.D. did not know she needed to wear underwear, had frequent toileting accidents, and would hide her soiled clothing in her dresser drawers.

The caregiver reported M.D. exhibited "food insecurity behaviors," such as believing someone would take away her meals, worrying about not having enough to eat, and " 'shoving' " food into her mouth or eating too quickly to the point that she would almost choke. M.D. was "afraid" to eat at school because she worried she would not have enough money to eat with the other children. She told the caregiver that she ate "dog biscuit treats" while in Father's care and she was "fearful there would be worms in her food [because] there were times that there were worms in the family dog's food."

The caregiver enrolled M.D. in the second grade at a public elementary school where she was "adjusting well." She also attended an after-school program. Although Father claimed to homeschool her with the help of "Education.com," M.D. was behind academically, did not know all the letters of the alphabet or all numbers, and only knew some of the colors. The caregiver read a book with M.D. each night and worked on identifying words and sounds. In December 2022, the juvenile court transferred M.D.'s educational and developmental rights to the caregiver because Father

Agency explains the addendum report was filed with the juvenile court on December 15 and was considered by the same judicial officer at a prior hearing. Father has not objected to the Agency's request that we consider the report. For these reasons, we have considered the addendum report as part of the record on appeal but note it contains limited information that was not necessary to our resolution of this appeal.

resisted M.D. receiving services from the San Diego Regional Center or any assessments by the school for an individual education program (IEP).

By January 2023, M.D. continued to do well in the caregiver's home. The caregiver reported that M.D. said she did not want to go back and live with Father because she " 'ha[d] a nice room . . . and food' " at the caregiver's home and because the caregiver took her to school and the after-school program. M.D. told the caregiver, " 'I know if I go back with my dad he won't take me to school because it costs too much money.' " When the caregiver explained that school is free, M.D. said Father " 'lied to me about that too.' " M.D. had told the caregiver multiple times that Father did not have food and she " 'doesn't want to ever be hungry again.' "

2.  *Father's Progress*

In November 2022, the Agency observed that Father's apartment was clean and organized, "[a]ll of the clutter, tools and miscellaneous scattered items had been removed"; there was dry food in the kitchen cabinets; and the electricity was working although the refrigerator was still inoperable. In December, Father informed the Agency he was able to maintain the electricity and the refrigerator was working; he painted the rooms, replaced tile, shampooed the carpet, and threw away unnecessary items like extra car parts.

The Agency referred Father to parenting education. Father completed an intake and started the "Safe Care Child and Infant Health Module." But he was inconsistent. He attended five sessions, cancelled one session, and was a "No Show[ ]" for two sessions. When the Agency asked Father about his lack of progress, he told the social worker he had already completed the parenting program in the *previous* dependency case. The social worker explained that M.D. was significantly older now with different developmental

needs and the parenting education is part of his case plan in this dependency case.

Father contacted a substance use specialist but failed to follow up with her as he was instructed to do. Father agreed to drug test on December 9, 2022 but did not show up for it.

The Agency informed Father it was processing a referral for him to start individual therapy, but Father agreed instead to participate in community-based therapy. The Agency provided Father with information for him to enroll in "Dads' Club, which is a service that provides a safe environment where fathers can come . . . together to learn about the vital role they play in healthy development and success of their children."

On January 11, 2023, Father informed the Agency he was unable to follow up with any of his services because his car was towed and he did not have it for the last three weeks. At the time of the jurisdictional and dispositional hearing, Father had neither completed the parenting education, seen a substance use specialist, or contacted Dad's Club for group therapy.

Father had visits with M.D. on five occasions in November and December 2022. The caregiver reported the visits went "well" and Father was "engaged and appropriate" during the visits. M.D. described her visits with Father as " 'happy' " and " 'great,' " and expressed excitement to see him.

3.    *Information from Extended Family Members*

The paternal grandmother informed the Agency "there were concerns for [M.D.] being by herself" and she reminded Father "he needed to check on [her] and give her something to eat." She "worrie[d]" that Father " 'gets so involved with working on the cars that he forgets she is up in the apartment." She had asked Father about M.D. not attending school and Father told her he was concerned his daughter might contract COVID. The paternal

11

grandmother believed Father " 'trie[d] hard to keep it together for [M.D.'s] sake and is committed to being a single dad,' " but he is "stubborn and [the family] give[s] him advice and suggestions and sometimes he will follow and sometimes he won't."

The paternal great uncle had called the Agency a few months prior with concerns of " '[b]asic[ ] neglect,' " including that M.D. was " 'left alone by herself during the day' " and she had never been in school despite being eight years old. He explained Father " 'was not financially able to provide services' " that M.D. needed and was overwhelmed and " 'too proud for whatever reason to reach out for help.' " He explained the situation was " 'common family knowledge' " and the family had offered Father opportunities to bring M.D. to Arizona, where paternal great uncle resided, and Father would have childcare from the aunt so he could work. But, according to the paternal great uncle, " '[F]ather did not think that was acceptable.' "

4.      *The Agency's Concerns*

The Agency recommended Father be offered family reunification services. It was concerned that Father "continually denie[d]" M.D. was left unattended for extended periods without food or electricity, or that he neglected M.D. in any way. The Agency emphasized that his denials were contradicted by M.D.'s behaviors and condition, including her leaving the caregiver's home through the bedroom window at night, displaying food insecurity, experiencing toileting accidents, and requiring extensive dental care. The Agency believed Father had not taken responsibility for his lack of supervision and care of M.D., and he needed parenting classes to address M.D.'s developmental and medical needs and gain insight into the protective issues that led to dependency.

12

B.  *Father's Testimony*

Father denied leaving M.D. home without supervision on October 5, 2022.  But when asked what happened that day and whether he made arrangements for someone to supervise her, he invoked his Fifth Amendment right against self-incrimination and declined to answer those questions because he had an ongoing criminal matter.[8]  He maintained, however, that M.D. "wasn't injured" and "wasn't in need of medical attention."

C.  *Juvenile Court's Findings and Orders*

Father asked the juvenile court to dismiss the petition, arguing the Agency had not met its burden of proving that M.D. needed the protection of the court.  As to count 1, Father's counsel argued eight-year-old children are "frequently" left home alone briefly and are safe.  M.D. was familiar with the people in the apartment complex and would go to them if she felt unsafe, and she had a dog with her which was "another added measure of protection should anybody confront" her.  Counsel argued that although there was "not a lot of food" in the apartment, nothing indicated M.D. was "failing to thrive physically or starving or malnourished."  As to count 2, counsel argued the condition of the home did not present harm to M.D., the condition had since been ameliorated, and there was no allegation that M.D. was impacted in any way.

The juvenile court found both counts in the petition true by clear and convincing evidence and declared M.D. to be a child described by section 300, subdivision (b).  The court acknowledged that Father loved M.D. and she was attached to him, and believed he was a single parent who "seem[ed] to be

---

[8]    After M.D. was taken into protective custody on October 5, 2022, Father was arrested and charged with felony child cruelty.  Those charges were pending at the time of the hearing.

overwhelmed on a daily basis . . . as far as providing for the child and actually being there and interacting with the child." However, the court found M.D. "completely credible" in her accounts of being locked in the home alone on multiple occasions, including on October 5, 2022, and concluded that Father's care left her with "food insecurity issues." The court found it true that M.D. "would eat the dog biscuits and she was fearful that the worms from the bowl for the dog food would somehow impact her" and "these are terribly traumatic experiences for this young child."

As to disposition, Father asked that M.D. be returned to his care, or alternatively that he be granted unsupervised visitation. The Agency argued M.D. would not be safe with Father even for short unsupervised visits because he had still not engaged in services and did not recognize the safety issues. The juvenile court agreed Father needed to acknowledge that stable and appropriate housing is necessary for M.D. to feel safe, and he needed to demonstrate an ability to recognize the "stressors and trauma" that M.D. had been exhibiting. The court declared M.D. a juvenile court dependent and found by clear and convincing evidence that removal from Father's custody was appropriate under section 361, subdivision (c)(1). The court ordered supervised visits for Father because he had not followed through with the service referrals and without insight into the issues, the court did not believe it would be safe yet for M.D. to have unsupervised visits with him.

## DISCUSSION

### I.

### *Substantial Evidence Supports the Jurisdictional Findings*

Dependency jurisdiction may be assumed over a child and her parent under section 300 if the child has suffered or is at substantial risk of suffering serious physical harm or illness as a result of the parent's failure or inability

to adequately supervise or protect the child, as alleged in count 1 (§ 300, subd. (b)(1)(A)), or the parent's willful or negligent failure to provide the child with adequate food, clothing, shelter, or medical treatment, as alleged in count 2 (§ 300, subd. (b)(1)(C)). "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411, review denied May 31, 2023, S279249.) However, the juvenile court may consider past events when determining whether a child presently needs its protection. (*Ibid.*; *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) Although "[e]vidence of past conduct may be probative of current conditions," past conduct standing alone does not establish a substantial risk of harm. (*In re D.L.*, at p. 1146.) Instead, there must be some reason to believe the acts may continue in the future. (*Ibid.* ["To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' "].)

Effective January 1, 2023, subdivision (b)(2)(C) of section 300 provides: "A child shall not be found to be a person described by this subdivision *solely due to . . . [i]ndigence or other conditions of financial difficulty*, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare." (Stats. 2022, ch. 832, § 1 (Sen. Bill No. 1085), italics added.) By its plain language, the exclusion applies only when dependency jurisdiction is asserted "solely due to" a circumstance of

15

indigency or financial difficulty.  (§ 300, subd. (b)(2)(C); *Green v. State of California* (2007) 42 Cal.4th 254, 260 [under settled canons of statutory construction, "[w]e must look to the statute's words and give them their usual and ordinary meaning" and "[i]f the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent"].)  We thus agree with the court in *In re L.B.* that "indigence *may* be a factor considered under section 300, subdivision (b), so long as [it is not] the only factor.  For example, substance abuse or mental health issues that lead to homelessness or indigence, putting children at risk, could potentially support jurisdiction under subdivision (b) of section 300." (*In re L.B., supra,* 88 Cal.App.5th at pp. 413–414, review denied, italics added.)

Although the statutory language is unambiguous, the legislative history of Senate Bill 1085 supports this interpretation.[9]  (See *People v. Arias* (2008) 45 Cal.4th 169, 177 ["If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy."].)  As the court noted in *In re L.B., supra*, 88 Cal.App.5th at page 413, review denied, Senate Bill 1085 added the indigency provision and grouped it with two other exclusions involving homelessness and the failure to obtain custody orders to protect a child into current subdivision (b)(2) of section 300.  That statute provides:

> "A child shall not be found to be a person described by this subdivision solely due to any of the following: [¶] (A)

---

[9]     On our own motion, we take judicial notice of the legislative history of Senate Bill No. 1085 (2021–2022 Reg. Sess.) (Senate Bill 1085).  (Evid. Code, § 452, subd. (c); *Kern v. County of Imperial* (1990) 226 Cal.App.3d 391, 400, fn. 8 [appellate court may take judicial notice of legislative history materials on its own motion].)

Homelessness or the lack of an emergency shelter for the family. [¶] (B) The failure of the child's parent or alleged parent to seek court orders for custody of the child. [¶] (C) Indigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare."  (§ 300, subd. (b)(2).)

"Senate Bill 1085 makes clear that the three exceptions to jurisdiction under subdivision (b) are meant to be similarly construed:  'Existing law prohibits a child from being found to be within the jurisdiction of the juvenile court [under subdivision (b)] solely due to the lack of an emergency shelter for the family or the failure of the child's parent or alleged parent to seek court orders for custody of the child.  [¶]  This bill would also prohibit a child from being found to be within the jurisdiction of the juvenile court [under subdivision (b)] solely due to indigence or other conditions of financial difficulty.'  (Legis. Counsel's Dig., Sen. Bill No. 1085 (2021–2022 Reg. Sess.); see also Assem.Com. on Judiciary, Analysis of Sen. Bill No. 1085 (2021–2022 Reg. Sess.) as amended June 9, 2022, pp. 5–6[.])"  (*In re L.B.*, at p. 415.)

In support of the bill, the National Association of Social Workers California Chapter wrote:  "Currently, the definition of neglect is overly broad.  It provides a social worker free reign to initiate the removal of a child from their parents for relatively minor circumstances relating to poverty.  The definition in the [Welfare & Institutions Code] should be refined so that conditions such as a partially empty refrigerator, damaged furniture, or temporary inability to afford childcare while working a low wage job will not alone result in the removal of a child from their parents."  (Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Bill No. 1085 (2021–2022 Reg. Sess.) as amended June 9, 2022, p. 4.)

The Judiciary Analysis of Senate Bill 1085 further stated:  "The author and sponsor of the bill report that, in practice, dependency jurisdiction has

17

been exercised over children where their parents have been unable to afford items deemed necessary by a social worker, such as cough syrup. . . . The author, sponsor, and supporters thus believe it is important to clarify that conditions of poverty *alone* do not give a dependency court jurisdiction over a child." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1085 (2021–2022 Reg. Sess.) as amended June 9, 2022, p. 5; see *ibid.* [" 'indigency, by itself, does not make one an unfit parent' "].) The Judiciary Analysis further stated, "This bill sets forth legislative intent to clarify that *it is harm to the child*, not poverty, that can result in dependency court jurisdiction." (*Ibid.*, italics added.)

Relying on the newly added indigency provision, Father now asserts jurisdiction was improper because the conditions on which the juvenile court determined he failed to protect M.D. are "solely because Father is indigent or otherwise experiencing financial difficulty," and thus M.D. is a child within the exclusion. We disagree.

"A jurisdictional finding that the minor is a person described in section 300 must be made by at least a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 [ ].) 'We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence.' (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137–138 [ ].) 'The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order.' " (*In re L.B.*, *supra*, 88 Cal.App.5th at pp. 411–412.) We conclude Father has failed to carry that burden. The record establishes that the juvenile court assumed

jurisdiction on conditions that posed a defined risk of harm to M.D., conditions that were not *solely* due to Father's indigence or circumstances of financial difficulty.

The Agency alleged in count 1 of the petition that Father failed to adequately supervise or protect M.D., in that: "[T]he child was observed crawling in and out of the window of the home while her father was not present. She was also observed wandering, unsupervised in the apartment complex surrounding the home. The father was unable to be reached by phone for several hours after law enforcement made contact with the child. Further, the father has historically left the child unsupervised on several occasions for extended periods of time without arranging adult supervision, and instead, regularly relied upon the family dog to provide protection for the child."

Substantial evidence in the record supports the juvenile court's finding that these allegations were true, and M.D. was a person described by section 300, subdivision (b). (See § 300, subd. (b)(1)(A) [the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child"]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724–725 [jurisdiction under subdivision (b)(1) of section 300 requires substantial evidence of (1) a parent's failure to adequately supervise or protect the child, (2) causation, and (3) serious physical harm to the child, or the substantial risk of such harm].)

Law enforcement reports established that M.D. (whom the court found "completely credible") was discovered alone, roaming the apartment complex, unkempt and unbathed. She had no knowledge where her father was and had not seen him since the night earlier when he gave her a gas station pizza.

19

Father did not respond to the Agency's efforts to contact him until the day after M.D. was found unsupervised. This was not an isolated incident. M.D.'s statements to the social worker revealed she would be left alone by Father for 10 hours at a stretch with no arranged supervision; no access to prepared food, only water; and only the family dog to look to for protection. Neighbors reported seeing M.D. wandering the complex at 10 or 11 p.m. Margarita, the neighbor who intervened to help when M.D. was left alone for three consecutive days, stated Father would leave at night, return in the morning, and sleep during the day, a schedule that created no opportunity for him to monitor, assist, protect, or supervise his young daughter.

The potential for serious physical harm that is created when an eight-year-old child is so abjectly disregarded was easily observed in M.D.'s case. Deprived of adult supervision, she repeatedly left her confines and roamed around alone, including late at night. The physical dangers inherent in this scenario are self-evident—and yet Father did not seem to apprehend them. Paternal grandmother believed he simply forgot his daughter was in the apartment. When confronted by the social worker, Father insisted M.D. was not in danger when left alone because the dog was protecting her. Father refused offers of help and would not accept his family's proposed childcare opportunities. He simply denied neglecting M.D. or leaving her unattended. He did not believe he needed parenting classes, did not complete them, and did not avail himself of the substance abuse specialist or group therapy services provided by the Agency. The foregoing facts were documented in the record and served as substantial evidence Father did not accept, appreciate, or understand M.D.'s need for adult supervision and protection, or his corresponding obligation to attend to that need. That in turn supports the conclusion the risk of harm created by Father's failure to provide adequate

supervision and protection of M.D. continued to exist at the time of the jurisdictional hearing.

Although we could affirm the juvenile court's finding of jurisdiction on the basis of count 1 alone (see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"]; accord *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–876), we also conclude substantial evidence supports count 2 of the petition. In count 2, the Agency alleged that M.D. was at substantial risk of suffering physical harm or illness as a result of Father's willful or negligent failure to provide her with a suitable home, or consistent access to food, in that: "[T]he home was inadequate and unsanitary, including but not limited to: the home was dirty, cluttered with objects such as power tools, and the electricity was turned off within the home. Dog feces was also observed on the floors of the home; the refrigerator was inoperable and void of edible food. Additionally, the child was found without consistent access to food such that she was unable to eat regular meals."

The police officers who entered Father's apartment after finding M.D. roaming the complex unsupervised found she was living in filth. We have already summarized their vivid descriptions of a foul-smelling apartment strewn with "hordes of trash," car parts, electrical cords, and tools; a patio filled with dog feces; and an empty inoperable refrigerator. There was dry food on the shelves, but none of it had been prepared. M.D.'s statements to the social worker, and the observations of her caretaker, showed that M.D.,

21

left to fend for herself, had taken to eating dog biscuits. In addition to developing generalized food anxiety, she had developed a specific fear her food would be infected with worms like the ones she saw in her dog's dish.

Father argues the Agency presented no evidence the foregoing conditions were attributable to his *willful or negligent conduct*. We disagree. Piles of dog feces; "hordes" of trash; a pervasive stench; worms in the dog's dish: these are conditions that accumulate with time and inattention. Father lived in these surroundings with his daughter and was necessarily aware of them. There was no evidence he was physically incapable of cleaning; instead, the record reflected that he regularly repaired cars, which suggests he was able-bodied. Yet he had plainly failed to take even minimal steps to clean the living space in which he was raising his daughter, to the point that it had deteriorated to an unsafe state by the time he was contacted by law enforcement. The record further supports the inference Father chose to confine M.D. in this unhygienic environment, without access to prepared food, despite offers of help from his family and at least one neighbor. Given these circumstances, the court could reasonably conclude Father was failing to provide M.D. with adequate shelter and food, exposing her to a substantial risk of serious physical harm or illness, and that this failure was attributable, at a minimum, to Father's negligence.

Before the jurisdictional and dispositional hearing, Father reported that certain conditions in the apartment had been corrected. However, the record supports the view his underlying parenting issues remained unaddressed. His repeated denials that he had left M.D. alone without food or electricity, and his failure to take advantage of services offered to him or even to understand why he required them, supported the conclusion he continued to lack insight into the serious concerns that led to dependency.

22

The court could reasonably conclude on these facts that the substantial risk to M.D. created by Father's negligent disregard of her basic needs continued to exist at the time of the jurisdictional hearing. Thus, substantial evidence supports the juvenile court's jurisdictional finding based on count 2. (See § 300, subd. (b)(1)(C) [the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness . . . as a result of . . . [t]he willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment"]; *In re R.T.* (2017) 3 Cal.5th 622, 630 [observing that a parent's negligent conduct is sufficient to impose jurisdiction based on willful or negligent failure to provide adequate food, clothing, shelter, or medical treatment].)

Father does not dispute that he left M.D. unsupervised on more than one occasion, that his apartment was in a deplorable and unsafe state when M.D. was encountered by law enforcement, or that M.D. lacked consistent access to food. He maintains, however, that new subdivision (b)(2)(C) of section 300 prohibited the juvenile court from relying on these conditions to support jurisdiction because their sole cause was Father's indigence or other financial difficulty. He asserts that the Legislature that enacted Senate Bill 1085 "wants social workers to offer . . . famil[ies] reasonable services" to prevent juvenile court intervention. And he argues the conditions that led to dependency would not have existed "with adequate childcare and balanced meals that he apparently cannot afford."

We are not insensitive to Father's claims. The effects of poverty are manifold, and we can appreciate how an increase in income can help mitigate the difficulties a parent encounters in the course of raising a child. In this case, however, we disagree that the record supports the inference Father's indigence was the *only* condition that exposed M.D. to harm. Instead, his

23

failure to adequately protect and supervise M.D. and provide her a safe home was attributable to his negligent disregard for her basic needs. Interviews of his family and neighbors revealed he resisted offers of childcare help. When confronted by the social worker, he insisted a dog was adequate protection for M.D. He did not lack for food: there was dry food in the apartment, but he did not prepare it. M.D.'s testimony about eating dog biscuits supports the inference Father was able to buy food for the dog and thus prioritized food for the dog over ensuring appropriate food was available to M.D. The squalid condition of Father's apartment was attributable to his inexcusable neglect of M.D.'s needs and hygiene rather than his financial situation.

Further still, Father's insistence that M.D.'s educational needs were being adequately addressed was belied by evidence that at eight years old, she could identify only some colors and did not know all the letters of the alphabet. On appeal, Father asserts he "is financially unable to send [M.D.] to public school." Although this assertion is accompanied by citations to the clerk's transcript, our review of the referenced pages of the transcript reveals no such information. (See *Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1267 [an appellate court is entitled to disregard unsupported factual assertions].) To the contrary, the record reflects that Father told paternal grandmother he did not want to M.D. to attend school because of his concerns of COVID. And M.D., upon learning that public school is free, told her caretaker Father "lied to [her] about that too." A factfinder could reasonably infer Father's failure to educate M.D. was part of a pattern of poor choices Father made as the result of his own shortcomings as a parent, not his lack of sufficient financial resources.

As Father noted, the legislative intent behind Senate Bill 1085 was, in part, to ensure the Agency offer families reasonable services to prevent

24

juvenile court intervention.  Senate Bill 1085 added subdivision (b) to section 300.2 to codify that legislative intent, providing:  "It is the intent of the Legislature that families should not be subject to the jurisdiction of the juvenile court nor should children be separated from their parents based on conditions of financial difficulty, including, but not limited to, a lack of food, clothing, shelter or childcare.  Reasonable services to prevent juvenile court intervention or children being separated from their parents include services to alleviate a potential risk to a child based on conditions of financial difficulty, including but not limited to, referrals to community-based organizations." (§ 300.2, subd. (b); see also *In re L.B.*, *supra*, 88 Cal.App.5th at p. 415, fn. 6, review denied.)

But the Legislature also provided an important caveat.  It made clear that "[c]onsistent with existing law, no family should be subject to the jurisdiction of the juvenile court nor should children be separated from their parents based on conditions of financial difficulty *unless there is willful or negligent action or failure to act and a nexus to harm* such that the child has suffered or there is a substantial risk the child will suffer serious physical harm or illness." (§ 300.2, subd. (b), italics added; see also *In re L.B.*, *supra*, 88 Cal.App.5th at p. 415, fn. 6, review denied.)  Senate Bill 1085 did not change that "the purpose of [juvenile dependency law] is to provide maximum safety and protection for children who are currently . . . being neglected, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2, subd. (a).)

Here, the evidence before the court supported the conclusion that the harm to M.D. was the result of Father negligently failing to recognize and respond to M.D.'s most basic needs, and the risk of that harm continued at the time of the jurisdictional hearing.  Thus we conclude section 300,

subdivision (b)(2)(C), is inapplicable in this case, where indigence was not the sole factor placing M.D. at risk of harm pursuant to section 300, subdivision (b)(1). Substantial evidence supports the juvenile court's finding that jurisdiction was proper based on factors other than indigence alone.

## II.

### *Substantial Evidence Supports the Dispositional Order*

Next, Father challenges the dispositional order removing M.D. from his custody on the ground it is not supported by substantial evidence. He advances three arguments. First, he contends that because there is insufficient evidence to support jurisdiction, there is also insufficient evidence to support the dispositional order removing M.D. from his custody under section 361, subdivision (c). Second, he argues the dispositional order was based on speculation about the risks he may pose to M.D. Third, he argues that referrals for childcare and meal assistance were reasonable means by which M.D.'s physical health could be protected without removing her from his care. As we will explain, these arguments lack merit.

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169.) The court has broad discretion in selecting a disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

Section 361 provides in pertinent part: "A dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be

26

protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V., supra,* 217 Cal.App.4th at pp. 135–136.)

We review a removal order for substantial evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Ibid.*) Because section 361, subdivision (c), requires proof by clear and convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; see also *In re V.L.*, at pp. 154–155 [standard of review described in *O.B.* applies to removal findings under § 361, subd. (c)].) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V., supra,* 208 Cal.App.4th at p. 843.) The party challenging the juvenile court's order has the burden to show there is insufficient evidence to support the court's decision. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; *In re N.M., supra,* 197 Cal.App.4th at p. 168.)

27

Turning to Father's specific challenges to the juvenile court's dispositional order, his first argument based on the asserted insufficiency of the evidence to support the court's jurisdictional order fails. As we have already discussed, there is substantial evidence in the record supporting jurisdiction. This dispenses with Father's claim that the removal order must be reversed due to reversal of the jurisdictional findings.

Turning to Father's second argument, we disagree with his characterization of the removal order as based on "[s]peculat[ion] about the risks that Father may pose[.]" In ordering removal, the juvenile court found Father's failure to provide appropriate care was "terribly traumatic" for M.D., that Father still needed to gain insight into how to provide M.D. the structure she required in order to feel safe, and that he needed to demonstrate the ability to recognize the trauma M.D. had been "exhibiting." As we have already discussed, the evidence before the court showed eight-year-old M.D. was repeatedly left alone and unsupervised, in conditions that led to her wandering the complex unsupervised, including late at night. Even when she was supervised by Father, his care was egregiously deficient; in addition to leaving M.D. to subsist in filth, the record supports the inference she had not been taught matters of basic hygiene, such as how to brush her teeth. A factfinder could reasonably conclude, based on the evidence of Father's habitual parenting practices, coupled with his ongoing denial and lack of insight, that it was highly probable returning M.D. to his care put her at risk of physical danger. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1124–1125 ["in evaluating current risk, court should consider evidence of parent's current understanding of and attitude toward the past conduct that endangered a child" and evidence that the behavior is unlikely to change]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a

28

problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Moreover, despite the seriousness of his shortcomings as a parent, Father was unable to understand why he was being reoffered parenting classes. He not only failed to take full advantage of the services offered to him, but he showed no interest in doing so. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 217 [trial court may consider the parent's unwillingness to comply with Agency attempts to provide assessments and services geared towards making reunification possible].) This case is not like *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 662, which Father cites for the proposition that a "hunch" about safety concerns is insufficient to support removal. Here, unlike *M.G.*, the Agency articulated specific reasons why M.D. would be at risk if returned to Father's care. (Cf. *id.* at pp. 661–662.) Thus we reject Father's contention that the removal order was based on speculation and conclude instead that it was supported by substantial evidence in the record.

Father's third and last challenge to the dispositional order is that referrals for childcare, meals assistance, and "related family-maintenance services" (boldface and capitalization omitted) were reasonable means of protecting M.D. without removing her from his care. We disagree that the record supports the view these services were a reasonable alternative to removal in this case. As we have discussed, before the court removes a child from parental custody, it must find there are no reasonable means by which the child's physical health can be protected without removal. (See § 361, subd. (c)(1).)

29

Here, M.D.'s removal was prompted not just by Father's lack of access to prepared meals or available childcare, but by Father's demonstrated, ongoing difficulty recognizing and appropriately responding to M.D.'s essential needs as a child. The evidence showed Father placed M.D. in situations that threatened her health despite offers of help from his family and Margarita that would have addressed her childcare, nutritional, and hygiene needs. It was Father's lack of good judgment that posed a danger to M.D. His continuing insistence that a dog was an appropriate guardian of his child is illustrative of the mindset that caused the Agency and the juvenile court such concern. Childcare and meal assistance would not have addressed the core issue that posed a danger to M.D., which was Father's lack of insight into his parenting responsibilities, M.D.'s developmental needs, and why the conditions of his home and leaving M.D. alone were dangerous. Without such insight, a reasonable trier of fact could have found there were no reasonable means to protect M.D.'s physical safety short of removing her from Father's custody.

In summary, substantial evidence supports the juvenile court's findings, under a clear and convincing standard, that there would be a risk of danger to M.D. if she were returned to Father's custody, and that there were no reasonable means to protect her other than removal from Father's custody.

## DISPOSITION

The juvenile court's January 13, 2023 order is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.

Filed 7/20/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | D081568 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15072) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| MIGUEL D., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed July 11, 2023 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.


McCONNELL, P. J.

Copies to:  All parties