Filed 9/15/25; Certified for Publication 10/8/25 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GIOVANNI DE MEO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COOLEY LLP,<br><br>    Defendant and Respondent. | D084269<br><br><br>(Super. Ct. No. 37-2022-00022799-CU-PN-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, James A. Mangione, Judge.  Affirmed.

Brian P. Worthington, for Plaintiff and Appellant.

Complex Appellate Litigation Group, Johanna S. Schiavoni and Melanie Gold; Pestotnik LLP, Timothy R. Pestotnik and Russell F. Winslow for Defendant and Respondent.


Giovanni De Meo appeals from a summary judgment in his lawsuit against the law firm Cooley LLP (Cooley).  De Meo alleges that Cooley breached a fiduciary duty to him and engaged in fraudulent concealment while performing legal work on business transactions in 2017 and 2021.

We conclude that the trial court properly entered summary judgment in favor of Cooley, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The History of Dealings Between De Meo and Cooley*

1.    *Dealings Starting in 2014*

The history of the dealings between Cooley and De Meo begins with De Meo's status as a co-founder, along with Abhishak Beniwal, of ReTech Labs, Inc. (ReTech).

In 2014, ReTech engaged Cooley to serve as ReTech's primary outside corporate counsel. De Meo signed the engagement agreement on behalf of ReTech. The engagement agreement stated, "In instances in which we represent a corporation, partnership or other legal entity, our relationship is with, and hence this duty of confidentiality is owed to, the entity, and not to the entity's parent or subsidiary entities, or its shareholders, members, officers, directors or partners."

In January 2015, De Meo asked the Cooley partner in charge of the firm's representation of ReTech if Cooley would represent him (De Meo) in a dispute with a former employer. The Cooley partner responded, "Given that we represent ReTech, and not any individual founder or employee, I think it would be best if you contacted someone outside of Cooley for some assistance." Thereafter, until October 13, 2021, there was no contact between Cooley and De Meo.

In February 2015, De Meo surrendered all of his stock in ReTech. Next, in November 2015, De Meo and Beniwal formed Rebotics, LLC (Rebotics), with De Meo holding 33.33 percent of the shares, and ReTech owning the rest. Cooley was not involved in the formation of Rebotics.

2

In October 2017, De Meo transferred to ReTech a portion of his interest in Rebotics, resulting in De Meo thereafter having a 15 percent ownership interest in Rebotics, and ReTech having an 85 percent ownership interest (the 2017 Transaction). At the instruction of its client, ReTech, Cooley prepared the documents for the 2017 Transaction, which included revisions to the Rebotics Operating Agreement. However, Beniwal—not Cooley—gave the documents to De Meo to sign. Cooley did not communicate with De Meo regarding the 2017 Transaction and was not involved in negotiating the terms of the 2017 Transaction.

In September 2018, Rebotics entered into a written engagement agreement with Cooley concerning a software services agreement for use with a Rebotics customer. De Meo had no involvement in Rebotics's engagement of Cooley in September 2018. Indeed, although De Meo served as an employee of Rebotics until July 31, 2018, at the time of Rebotics's September 2018 engagement agreement with Cooley, De Meo's involvement with Rebotics was solely as a minority member with a 15 percent interest.

2.    *Dealings During the 2021 Transaction*

On October 12, 2021, Beniwal told De Meo about a planned transaction in which ReTech and Rebotics would be sold to Symphony AI, and which was projected to close in three days (the 2021 Transaction). The deal had been negotiated over the course of several months, with Cooley representing ReTech and Rebotics. Beniwal explained to De Meo the compensation that he would receive in the transaction due to his ownership interest in Rebotics.

The next day, De Meo began searching for a lawyer to represent him in connection with the 2021 Transaction. On October 14, 2021, De Meo entered into an engagement agreement with Procopio, Cory, Hargreaves & Savitch LLP (Procopio). The engagement agreement states, "You have engaged the

Firm to advise and represent you in connection with: general corporate advice, including review of an LLC agreement, and possible negotiation of a sale of LLC interests."

According to De Meo, on October 13 and 14, 2021, Beniwal forwarded to him several emails involving the 2021 Transaction that originated with Cooley attorneys, and De Meo responded to some of the emails, including to Cooley attorneys. On October 15, 2021, a Cooley attorney emailed De Meo a set of blank signature pages for the transaction.[1] De Meo did not provide signatures.

Later on October 15, 2021, Cooley emailed De Meo six documents related to the transaction, indicating that some of them were still in draft form. De Meo responded the same day by stating, "I just spoke with my attorney and, as promised, I am following up regarding timing to review the documents. It is clear that the amount of content that needs to be reviewed will not be done before the end of today. I need a reasonable amount of time to review, consider, and respond to the offer and my attorneys also need a reasonable amount of time to review and respond. Therefore, I will not be able to sign anything today. Also, I will need completed documents in order to do a final review before signing anything."

On October 16, 2021, Cooley attorney Amy Hallman Rice sent an email to De Meo, in which she stated that she and another Cooley attorney "would be happy to speak with you and your counsel . . . to provide an overview of

---

[1] According to a declaration from a Cooley attorney who worked on the 2021 Transaction, it is a "customary" practice for the parties to a transaction to exchange signatures, which are then "held prior to the agreements being finalized," and in this case, "the plan was that the signatures were to be held until [De Meo] agreed to the terms set forth in the agreements he was asked to sign."

4

the transaction and walk through the documentation if that would be helpful." De Meo expressed interest in such a conversation, which was arranged for the same day. De Meo joined the call, but his attorney did not.

According to Hallman Rice's declaration, she "started that conversation with [De Meo] by expressly stating that we (Cooley [the other Cooley attorney], and I) only represented ReTech. Further, I expressly stated that we did not represent [De Meo]." Hallman Rice declared, "Given that [De Meo's] counsel did not join the . . . call . . . , I told [De Meo] that we would be happy to schedule a call with [De Meo] and his personal counsel to go over any questions they had concerning the 2021 Transaction and to discuss the transaction documents. I explained that I would not be able to discuss the documents in detail without his personal counsel present on the . . . call, and I only briefly described the purpose of the transaction documents at a very high level." De Meo submitted no evidence disputing Hallman Rice's statement that the substantive information discussed on the call involved only a high-level description of the purpose of the transaction documents.

During a deposition, De Meo described what Hallman Rice said on the October 16, 2021 call about whether Cooley was representing him.

> "Q. . . .[Y]ou understood it, that afternoon, on the 16th of October, from that moment on, you knew that they weren't your lawyers, even if you were confused about that at any point up to that, right?
>
> "A. I didn't know they weren't. I know that's what they said.
>
> "Q. Well, they made it clear they weren't your lawyer during that conference call, didn't they?
>
> "A. They made it clear. They believed they weren't."

After the call with Cooley, De Meo spent "20 [to] 60 hours" reading and analyzing the relevant transaction documents. On October 18, 2021, De Meo

contacted Beniwal directly to tell him that the terms of the deal were unacceptable to him unless his total compensation was increased. After direct communications on October 18 and 19, 2021, between De Meo and Symphony AI, De Meo reached a separate deal with Symphony AI. Specifically, Symphony AI agreed to (1) delete certain non-compete/non-solicit provisions regarding De Meo, and (2) pay De Meo an additional $100,000 for his minority interest in Rebotics. Cooley did not participate in those negotiations.

On October 19, 2021, after De Meo reached agreement with Symphony AI, he sent an email to Symphony AI, copying Beniwal and others. De Meo stated, "I will reach out to Re[T]ech's legal counsel (Cooley) to request adjustments to reflect the additional $100,000 to me at closing and the modification for the removal of the Non-Competition [provision], but retaining the provisions for Confidentiality and Non-Disparagement. [¶] This should all occur this morning so that the transaction can close today." The parties then executed all the relevant documents on October 19, 2021, and the transaction closed.

B. *De Meo's Lawsuit Against Cooley*

On June 13, 2022, De Meo filed a lawsuit against Cooley. The operative second amended complaint (the Complaint) alleges (1) breach of fiduciary duty, and (2) fraudulent concealment.

In the "General Allegations" section of the Complaint, De Meo alleged that, due to Cooley's representation of Rebotics, he believed Cooley was acting as his attorney and was acting to protect his interests during the 2017 Transaction and the 2021 Transaction. As to the 2017 Transaction, De Meo alleged that he "understood that Cooley was acting as attorneys for Rebotics, and because De Meo and Beniwal (through ReTech) were the owners of

6

Rebotics, he understood that to mean that Cooley was acting as attorneys for, and was acting to protect the best interests of, both De Meo and Beniwal." De Meo alleged that he "would not have signed the agreement he signed" for the 2017 Transaction if he believed that Cooley was not representing him.[2] Regarding the 2021 Transaction, De Meo alleged that he "remained of the understanding that Cooley was counsel for Rebotics, and as such would also act to protect De Meo's best interests." Without elaborating further, De Meo alleged that he "would have proceeded differently" had he believed Cooley was not representing him during the 2021 Transaction.

In the breach of fiduciary duty cause of action, the Complaint alleged that, due to its representation of Rebotics, "Cooley owed a fiduciary duty to De Meo, as a Member of Rebotics, under [California State Bar Rule of Professional Conduct] 1.13(f), to explain the identity of Cooley's client whenever the Cooley lawyers knew or reasonably should have known that Rebotics' interests were adverse to De Meo's."[3] Allegedly, "Cooley breached

---

[2] Specifically, the Complaint alleged that the documentation for the 2017 Transaction did not include terms regarding (1) the salaries of De Meo and Beniwal; and (2) the planned transfer to investors of the shares that De Meo was surrendering in the transaction, along with shares held by ReTech. De Meo alleged that Beniwal did not end up fully honoring those terms,!(1 AA 51)! and had he believed Cooley was not representing him, he would have insisted on including those terms in the agreement.

[3] Rule 1.13(f) of the California State Bar Rules of Professional Conduct (Rules of Professional Conduct) provides, "In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing." All further references to rules are to the Rules of Professional Conduct.

7

its fiduciary duty to De Meo in that no Cooley lawyers ever explained to De Meo, when they [were] required to, who the firm's client was and that the firm could not advise De Meo or give him legal advice as to his best interests regarding the transaction to transfer 18 1/3% of his membership interest in Rebotics [during the 2017 Transaction] (or any other matters)" and because Cooley "*purposely* concealed from De Meo critical information about its role and obligations."

In the fraudulent concealment cause of action, the Complaint alleged that Cooley "had a duty under [rule] 1.13(f) [of the Rules of Professional Conduct] to disclose facts to De Meo relating to the identity of [Cooley's] clients and the nature of [Cooley's] duties and obligations to that client and to De Meo." According to the Complaint, Cooley "intentionally failed to disclose that information to De Meo."

C.    *The Summary Judgment Motion*

Cooley moved for summary judgment, or in the alternative, summary adjudication. Cooley argued that as to both the 2017 Transaction and the 2021 Transaction, De Meo would be unable to prove either an express or implied attorney-client relationship to support his breach of fiduciary duty claim. Further, to the extent De Meo attempted to rely on rule 1.13(f) of the Rules of Professional Conduct to support his breach of fiduciary duty claim, Cooley argued that there was no evidence it acted in contravention of that rule with respect to De Meo, and that, in any event, the rule does not create a fiduciary duty to a nonclient or give rise to a tort claim for its breach. As to the fraudulent concealment cause of action, Cooley pointed out that the cause of action, which relied solely on Cooley's alleged noncompliance with rule 1.13(f), failed for the same reasons. Finally, Cooley relied on a release of

8

claims against "attorneys" that De Meo signed in connection with the 2021 Transaction to argue that De Meo had released his claims against Cooley.

In opposition, De Meo argued that a triable factual dispute existed as to whether an implied attorney-client relationship existed between Cooley and De Meo, which gave rise to a fiduciary duty that Cooley breached. As to his breach of fiduciary claim, De Meo also contended that even if no attorney-client relationship existed, Cooley still owed a fiduciary duty to him, as a nonclient, based on rules 1.13(f), 4.1 and 4.2 of the Rules of Professional Conduct. In support of the fraudulent concealment cause of action, De Meo argued that Cooley engaged in fraudulent concealment because, at some point during the 2021 Transaction, Hallman Rice allegedly concealed from him that the deal documents she sent to him were not in their final form. Finally, De Meo disputed Cooley's claim that he had released his claims against it.

In opposition De Meo submitted his own declaration, as well as a declaration from Edward McIntyre, who identified himself as an expert on legal ethics and professional responsibility (the McIntyre Declaration). Cooley filed evidentiary objections to statements appearing in both declarations.

The trial court granted Cooley's motion for summary judgment. The trial court ruled that, based on the undisputed facts, Cooley was not in an attorney-client relationship with De Meo during either the 2017 Transaction or the 2021 Transaction. The trial court further explained that, to the extent Cooley's compliance with rule 1.13(f) was relevant to De Meo's claims, the undisputed facts showed that Cooley complied with its obligations under that rule. As to the fraudulent concealment cause of action, the trial court declined to consider De Meo's reliance on Hallman Rice's alleged concealment

9

about the deal documents not being in their final form when they were sent to De Meo, as that theory was not pled in the Complaint. The trial court did not discuss Cooley's alternative argument that summary judgment was warranted based on the release that De Meo executed in the 2021 Transaction. The trial court also sustained several of Cooley's evidentiary objections to De Meo's declaration and all of its objections to the McIntyre Declaration.

De Meo appeals from the judgment.

## II.

## DISCUSSION

A. *Legal Standards Applicable to the Review of a Summary Judgment Ruling*

" 'A trial court properly grants a motion for summary judgment where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc. § 437c, subd. (c).) "Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

As we will discuss in the course of our analysis, De Meo contends that the trial court erred in sustaining certain evidentiary objections raised by Cooley. The standard of review for assessing the court's evidentiary rulings in the summary judgment context is not fully settled, as our Supreme Court

10

has declined as yet to address the issue. (See *Reid v. Google, Inc.*, 50 Cal. 4th 512, 535 ["we need not decide generally whether a trial court's ruling on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"].) One panel of this court, in *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206 stated that "[d]e novo review is proper where evidentiary objections raise questions of law, such as whether or not a statement is hearsay," but "[i]n contrast, evidentiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Id.* at p. 226.) Other recent opinions from our court, although noting the question is unsettled, have applied the abuse of discretion standard. (*Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118; *Mackey v. Board of Trustees of California State University* (2019) 31 Cal.App.5th 640, 657, 660; see also *Doe v. SoftwareONE Inc.* (2022) 85 Cal.App.5th 98, 103 & fn. 2 [opinion from Division 3, observing the inconsistency between this court's opinions in *Alexander* and *Schmidt*, and stating that "the weight of authority since *Reid* supports application of the abuse of discretion standard"].)

B.    *Summary Judgment Was Properly Granted on the Breach of Fiduciary Duty Cause of Action*

We first consider De Meo's contention that the trial court erred in granting summary judgment on the breach of fiduciary duty cause of action. "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West*).)

Cooley's motion for summary judgment focused, to a large extent, on the first element. Specifically, Cooley argued that, based on the undisputed

11

facts, De Meo would not be able to establish that Cooley entered into a fiduciary relationship with him.

De Meo identifies two theories under which Cooley owed him a fiduciary duty: (1) based on an attorney-client relationship; and (2) based on certain provisions in Rules of Professional Conduct that the describe how lawyers should conduct themselves toward nonclients. We discuss each theory in turn.

1. *Based on the Undisputed Facts, Cooley and De Meo Did Not Enter Into an Attorney-Client Relationship*

De Meo's first theory is that Cooley owed him a fiduciary duty because it was representing him. It is well established that an attorney owes a fiduciary duty to a client. (*California Self-Insurers' Security Fund v. Superior Court* (2018) 19 Cal.App.5th 1065, 1071.) " ' " 'The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity—*uberrima fides*.' [Citations.] Among other things, the fiduciary relationship requires that the attorney respect his or her client's confidences. [Citations.] It also means that the attorney has a duty of loyalty to his or her clients." ' " (*Ibid*.) However, "[t]o state the obvious, an attorney's duty to his or her client depends on the existence of an attorney-client relationship. If that relationship does not exist, the fiduciary duty to a client does not arise. [Citations.] Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal." (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959.)

De Meo does not allege that he and Cooley ever entered into an *express* contract for legal representation. Although Cooley entered into express contracts with ReTech in 2014 and with Rebotics in 2018, the general rule is that "when 'representing a corporation, an attorney's client is the corporate

12

entity, not individual shareholders or directors, and the individual shareholders or directors cannot presume that corporate counsel is protecting their interests.' " (*Sprengel v. Zbylut* (2019) 40 Cal.App.5th 1028, 1042 (*Sprengel*).) "An attorney representing a corporation does not become the representative of its stockholders merely because the attorney's actions on behalf of the corporation also benefit the stockholders." (*Skarbrevik v. Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 703.) Thus, the express agreements with ReTech and Rebotics cannot reasonably be understood as express agreements that Cooley would also represent De Meo due to his status as a shareholder of ReTech and a member of Rebotics.

However, in the absence of an *express* relationship, in some instances an *implied* attorney-client relationship may arise between an attorney and an individual constituent of the entity that the attorney represents. (*Sprengel, supra*, 40 Cal.App.5th at p. 1046 ["an implied attorney-client relationship may be formed between the attorney for a corporate entity and the entities' individual constituents"]; *Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 316 [quoting *Sprengel*].) Relying on that principle, despite the absence of an express agreement, De Meo contends that "a reasonable person in De Meo's situation . . . would understand or expect that an attorney-client relationship existed between De Meo and Cooley during the course of the 2021 [T]ransaction."

> a.    *The Trial Court Properly Declined To Consider Certain Statements in De Meo's Declaration When Deciding Whether an Implied Attorney-Client Relationship Existed*

"Whether an attorney-client relationship exists is a question of law." (*Johnson v. Superior Court* (1995) 38 Cal.App.4th 463, 477 (*Johnson*).) However, "if the evidence of facts bearing upon this decision is in conflict, its resolution is to be made by the finder of fact." (*Ibid*.) De Meo contends that

13

statements in his declaration, had the trial court considered them, would have created a triable issue of material fact on a subsidiary factual issue relevant to the legal determination of whether he and Cooley entered into an implied attorney-client relationship with respect to the 2021 Transaction. However, the trial court sustained Cooley's objections to those statements. Therefore, before proceeding to the legal issue of whether Cooley and De Meo entered into an implied attorney-client relationship, we must first address De Meo's contention that the trial court erred in sustaining Cooley's evidentiary objections to certain statements in his declaration.

As we have explained, during his deposition, De Meo testified as follows about what Hallman Rice said during the October 16, 2021 call:

"Q.　. . .[Y]ou understood it, that afternoon, on the 16th of October, from that moment on, you knew that they weren't your lawyers, even if you were confused about that at any point up to that, right?

"A.　I didn't know they weren't.  I know that's what they said.

"Q.　Well, they made it clear they weren't your lawyer during that conference call, didn't they?

"A.　They made it clear.  They believed they weren't."

However, in his declaration, De Meo stated, "*[Hallman Rice] did **not** tell me during the October 16 . . . call that she (or Cooley generally) did not represent me.  She did not use any words or terms that were anywhere near as exact or clear as that.*  When I asked who she represents, Hallman Rice gave multiple answers.  First she said that Cooley represents Rebotics.  When I responded by confirming that Cooley represents Rebotics, Hallman Rice then changed her answer and said Cooley represents ReTech.  *She never said she does not represent me.*"  (Italics added.)

14

Cooley objected to the portions of the statement appearing in De Meo's declaration that we have italicized. Cooley also objected to another similar statement appearing in De Meo's declaration: "At no time did anyone at Cooley ever advise me that the identity of Cooley's client was Rebotics and not me individually." The trial court sustained the objections.

Cooley's objections were premised on the principle set forth in *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*), in which our Supreme Court stated, " '[w]here . . . there is a clear and unequivocal admission by the plaintiff, himself, in his deposition' " and the plaintiff contradicts that admission in a subsequent declaration, " 'we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact.' " (*Id.* at p. 21.) "[T]he classic *D'Amico* situation" occurs where "a party takes a position under oath in discovery; the opponent moves for summary judgment; and in opposition the party files a declaration that conflicts with its earlier testimony." (*Turley v. Familian Corp.* (2017) 18 Cal.App.5th 969, 981.) "In that situation, courts have held that the court may disregard the declaration." (*Ibid.*) "Properly understood, *D'Amico* does not state a rule regarding the admissibility of evidence; instead, the case provides guidance in determining whether a declaration that contradicts prior discovery responses is sufficient to create a triable issue of fact." (*Harris v. Thomas Dee Engineering Co., Inc.* (2021) 68 Cal.App.5th 594, 604 (*Harris*).)

One court has suggested that when the issue on appeal is whether the trial court erred in sustaining an evidentiary objection premised on *D'Amico*, *supra*, 11 Cal.3d 1, an appellate court should approach the issue de novo as part of its independent review of the summary judgment ruling. (*Harris*, *supra*, 68 Cal.App.5th at pp. 604–605.) Further, as noted above, there is general uncertainty regarding the proper standard of review when an

appellant challenges an evidentiary ruling on an appeal from a summary judgment. (See section II.A, *ante*.) Here, however, we need not, and do not, resolve the issue of which standard of review applies to the trial court's exclusion of statements in De Meo's declaration on the ground that they contradicted De Meo's deposition testimony. As we will explain, even applying the more favorable de novo standard of review, the statements are not competent to create a triable factual issue on the existence of an attorney-client relationship.

Our inquiry in applying the principle set forth in *D'Amico* is whether " 'there is a clear and unequivocal admission by [De Meo] . . . in his deposition' " that De Meo later contradicted in his declaration. (*D'Amico*, *supra*, 11 Cal.3d at p. 21.) That is precisely what occurred here.

De Meo unequivocally testified that Hallman Rice communicated to him that she believed Cooley did not represent him. Specifically, when asked whether Cooley "made it clear" during the October 16, 2021 call that "they weren't your lawyer," De Meo stated that "they" (presumably referring to Hallman Rice) "made it clear. They believed they weren't." De Meo's statements in his declaration that Hallman Rice "did **not** tell me during the October 16 . . . call that she (or Cooley generally) did not represent me," "did not use any words or terms that were anywhere near as exact or clear as that," and "never said she does not represent me" are directly contradictory to that deposition testimony.[4]

---

[4]    Similarly, regarding the statement in De Meo's declaration that "[a]t no time did anyone at Cooley ever advise me that the identity of Cooley's client was Rebotics and not me individually," to the extent that statement asserts that no one at Cooley told De Meo that Cooley was not representing him, it is also directly contradicted by De Meo's deposition testimony.

De Meo contends that the rule set forth in *D'Amico, supra*, 11 Cal.3d 1, does not apply because his declaration was merely offered " 'to explain what was meant by his deposition testimony.' " (See *Mackey v. Board of Trustees of California State University* (2019) 31 Cal.App.5th 640, 658 [the principle set forth in *D'Amico* "does not apply where there is a 'reasonable explanation for the discrepancy' "].) We are not persuaded. De Meo's declaration did not merely explain what he meant by his deposition testimony. Instead, the portions of the declaration at issue here contained statements directly in contradiction to De Meo's deposition testimony. Specifically, at his deposition, De Meo testified that Hallman Rice made it clear that she believed Cooley did not represent him. In his declaration, De Meo directly contradicted that statement by claiming that Hallman Rice did *not* tell him "that she (or Cooley generally) did not represent me."

Accordingly, based on *D'Amico, supra*, 11 Cal.3d 1, De Meo is precluded from relying on his declaration to create a triable issue of fact regarding whether Hallman Rice told him that she believed Cooley did not represent him.

b.     *As a Matter of Law, the Undisputed Facts Establish That No Implied Attorney-Client Relationship Existed*

Having determined that De Meo's declaration does not create a triable issue of fact, we turn to the legal question of whether, based on the undisputed facts, De Meo and Cooley entered into an implied attorney-client relationship. (See *Johnson, supra*, 38 Cal.App.4th at p. 477 [once factual disputes are resolved, "[w]hether an attorney-client relationship exists is a question of law"].)

To resolve that issue, we look to the rules governing the creation of an implied contract. " 'An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) 'The distinction

17

between *express* and *implied in fact* contracts relates only to the *manifestation of assent;* both types are based upon the expressed or apparent intention of the parties.' " (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732–1733 (*Responsible Citizens*).) " 'An implied contract " ' . . . in no less degree than an express contract, must be founded upon an ascertained *agreement* of the parties to perform it, the substantial difference between the two being the mere mode of proof by which they are to be respectively established.' " [Citation.] . . . Although an implied in fact contract may be inferred from the "conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an *intent* to promise." ' " (*Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1010 (*Zenith*), first italics added.)

Applying the rules governing implied contracts in the context of an attorney-client relationship, "a plaintiff cannot unilaterally establish an attorney-client relationship, and its hindsight 'beliefs' that such a relationship existed are thus legally irrelevant. [Citation] Instead, it is the intent and conduct of the parties that controls the question as to whether an attorney-client relationship has been created." (*Zenith, supra*, 148 Cal.App.4th at p. 1010.) "When assessing the existence of an implied attorney-client relationship between a corporate attorney and the entity's individual members, the key inquiry is whether 'the totality of the circumstances' implies *an agreement* that the corporate attorney will not act adversely to the individual shareholder's interests with respect to the issues in dispute. [Citation.] Stated differently, we must assess whether the parties conducted themselves in a way that would reasonably cause a shareholder to

18

believe the attorney would protect the shareholder's individual interests."[5] (*Sprengel, supra*, 40 Cal.App.5th at p. 1047, italics added.) Put simply, "a client's subjective belief that an attorney-client relationship exists, standing alone, cannot create such a relationship, or a duty of care owed by the attorney to that plaintiff." (*Zenith, supra*, 148 Cal.App.4th at p. 1010.)

As we will explain, the undisputed facts establish that, with respect to the 2021 Transaction, Cooley did not reach a mutual agreement with De Meo that it would not act adversely to De Meo, did not indicate any intent to enter into such a relationship with De Meo, and did not conduct itself "in a way that would reasonably cause [De Meo] to believe the attorney would protect [his] individual interests." (*Sprengel, supra*, 40 Cal.App.5th at p. 1047.)

Most significantly, De Meo confirmed during his deposition that Hallman Rice said "they weren't [his] lawyers" and "made it clear" that "[t]hey believed they weren't." Because " ' "the very heart of this kind of [implied] agreement is an *intent* to promise," ' " (*Zenith, supra*, 148 Cal.App.4th at p. 1010), Hallman-Rice's statement to De Meo that she believed Cooley did not represent him weighs strongly against finding the existence of an implied attorney-client agreement.

De Meo focuses on the difference between his description of Hallman Rice's statement that she "believed" Cooley did not represent him and Hallman Rice's own description that she "expressly stated" that Cooley did

---

[5]     *Sprengel*, like the instant case, involved the question of whether a member of a limited liability company had entered into an implied attorney-client relationship with the attorney representing the limited liability company. (*Sprengel, supra*, 40 Cal.App.5th at p. 1032.) However, as *Sprengel* observed, the concept of an implied attorney-client relationship also arises in the context of a partnership. (*Sprengel*, at p. 1046, fn. 4, citing *Responsible Citizens, supra,* 16 Cal.App.4th 1717.)

19

not represent De Meo.  According to De Meo, that discrepancy raises a triable issue of fact.  However, we concur with the trial court's assessment that De Meo highlights "a distinction without a difference."  For the sake of our analysis, we will assume that De Meo accurately described Hallman Rice as only expressing a *belief*.  But Hallman Rice's disavowal of any attorney-client relationship, whether stated in the form of a belief or a more definitive assertion, still weighs strongly against the finding of an implied attorney-client relationship.

Other facts also weigh against the existence of such a relationship. First, Cooley and De Meo had very little contact over the years, and the limited communication that did take place points *away* from any attorney-client relationship.  It is undisputed that between January 2015 and October 13, 2021, De Meo and Cooley had no contact whatsoever.  Further, in the last communication (in January 2015) that De Meo had with Cooley before next interacting with Cooley regarding the 2021 Transaction, Cooley made it clear to De Meo that, in the context of its representation of ReTech, Cooley represented the entity, "not any individual founder or employee."

Second, immediately upon learning of the 2021 Transaction, De Meo took steps to hire a law firm, other than Cooley, to represent him.  De Meo's engagement agreement with Procopio stated that Procopio would "advise and represent" De Meo in connection with "review of an LLC agreement, and possible negotiation of a sale of LLC interests."  When De Meo sent an email to Cooley on October 15, 2021, he referred to "my attorneys," who needed time to review the relevant documents.  Similarly, in setting up the October 16, 2021 call, Hallman Rice told De Meo that she "would be happy to speak with you and your counsel."

Third, after the October 16, 2021 call, De Meo did not rely on Cooley to negotiate on his behalf with respect to the 2021 Transaction. Instead, after analyzing the relevant documents himself, De Meo contacted Beniwal and Symphony AI and then reached a deal with Symphony AI directly. Cooley was only informed of the deal after the fact, after De Meo told Symphony AI and Beniwal that he would "reach out to Re[T]ech's legal counsel (Cooley) to request adjustments" to reflect the side deal he had negotiated with Symphony AI.

All of those facts, taken together, establish as a matter of law that Cooley and De Meo did not enter into an implied attorney-client relationship regarding the 2021 Transaction. Not only did Hallman Rice tell De Meo that she believed Cooley did not represent him, De Meo hired his own attorneys to advise him regarding the 2021 Transaction, and De Meo did not involve Cooley in any of the negotiations on his behalf, describing Cooley as "Re[T]ech's legal counsel" and Procopio as "my attorneys." De Meo and Cooley therefore did not "conduct[ ] themselves in a way that would reasonably cause [De Meo] to believe [Cooley] would protect [De Meo's] individual interests" with respect to the 2021 Transaction. (*Sprengel, supra*, 40 Cal.App.5th at p. 1047.)

De Meo relies on certain undisputed facts to argue that a reasonable person would conclude Cooley entered into an implied attorney-client relationship with him. However, as we will explain, none of those facts are dispositive here.

First, De Meo points out that Cooley's client Rebotics was a limited liability company with only two members, namely ReTech and De Meo. Based on case law, De Meo views that fact as weighing in favor of an implied attorney-client relationship between him and Cooley. (See *Sprengel, supra*,

21

40 Cal.App.5th at p. 1046 [noting that a company's "status as an entity comprised of only two 50 percent shareholders is a factor that weighs in support of an attorney-client relationship"]; *Johnson, supra*, 38 Cal.App.4th at p. 476 ["The argument is that representation of a partnership of few members may suggest an individual representation of the members, while representation of a partnership with 'scores or even hundreds' of partners would not."].) We have no dispute with the general principle that, in some cases, the closely held nature of an entity may be relevant in determining whether an attorney entered into an implied agreement to represent one of the individual constituents of the entity. But that fact is certainly not dispositive when other facts point strongly in the other direction. (See *Sprengel*, at p. 1048 [despite the fact that the plaintiff was one of two members of a limited liability company, no attorney-client relationship existed between the plaintiff and the entity's attorney when the plaintiff "never spoke with defendants directly, never relied on their legal advice and never shared any confidential information with them."].) Aside from citing case law, De Meo has provided no explanation of how, based on the unique facts of this case, his status as a minority member of Rebotics gave rise to any sort of implied attorney-client relationship. Significantly, even though Rebotics was a small entity, De Meo had no contact whatsoever with Cooley during the time it represented Rebotics, up until the 2021 Transaction. And during the first significant conversation De Meo had with a Cooley attorney regarding the 2021 Transaction, Hallman Rice disavowed any attorney-client relationship. In that context, the fact that De Meo was one of only two members of Rebotics is not probative of whether Cooley acted as De Meo's attorney during the 2021 Transaction.

Second, case law observes that an attorney's work on matters of personal interest to an individual member may weigh in favor of an implied attorney-client relationship. (*See Johnson, supra*, 38 Cal.App.4th at p. 477 [explaining that an attorney's work on "routine partnership business, unrelated to the individual interests of [the partner]" would "negat[e] an implication of individual representation"].) De Meo points out that during the 2021 Transaction "Cooley was . . . heavily involved in the drafting, review and revisions of documents that directly impacted De Meo's legal interests." But that argument overlooks the crucial fact that De Meo *excluded* Cooley from his negotiations with Beniwal and Symphony AI to reach a side deal with Symphony AI that was more favorable to him. Cooley's exclusion from those negotiations weighs *against* the existence of any attorney-client relationship.[6]

Finally, De Meo points out that, even after learning he had retained an attorney, Cooley communicated directly with De Meo instead of through, or in the presence of, De Meo's attorney. De Meo cites rule 4.2(a), which states that "[i]n representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." (Asterisks omitted.) In light of this

---

[6] De Meo also relies on the fact that Cooley sent him blank signature pages on October 15, 2021. De Meo contends that, based on this action, "a reasonable person in De Meo's position would understand . . . that Cooley was his lawyer" because "[i]t requires tremendous trust for a person to blindly sign a document without seeing what it says." However, the undisputed evidence in the record indicates that such a practice is customary in anticipation of closing a deal. In light of that evidence, we are not persuaded that the action of sending blank signature pages is evidence that Cooley and De Meo entered into an implied attorney-client relationship.

rule, De Meo argues that "a reasonable person . . . would understand and believe that Cooley's continued communication directly with De Meo was due to the fact that Cooley was also his lawyer." The argument is not persuasive. Regardless of whether Cooley strictly complied with the requirements of Rule 4.2 (which we need not, and do not, address), De Meo has not pointed to any communication that took place between him and Cooley in the absence of his attorney that would suggest an attorney-client relationship. The first significant communication Cooley had with De Meo after being informed that he was represented by counsel was on the October 16, 2021 call. It is undisputed that Hallman Rice invited De Meo to join that call *along with* his attorney. When De Meo joined the call *without* his attorney, Hallman Rice told De Meo that she believed Cooley was not representing him, and she offered to set up a future call with De Meo and his attorney. Further, Hallman Rice declared that because De Meo's counsel was not present on the call, she "only briefly described the purpose of the transaction documents at a very high level." De Meo points out that, thereafter, Cooley did send emails directly to him attaching the relevant deal documents. However, De Meo has not shown that any of those communications contained the type of confidential information or legal advice that would be communicated between an attorney and a client. Further, the record contains no evidence that De Meo ever gave Cooley the name of his attorney or that attorney's contact information so that Cooley could send the documents to De Meo's attorney instead of directly to De Meo. Accordingly, we place little significance on the direct communications that took place between De Meo and Cooley after De Meo gave notice he was represented by counsel.

In sum, we conclude, based on the totality of the circumstances, that De Meo and Cooley did not enter into an attorney-client relationship with

24

respect to the 2021 Transaction.  Accordingly, to the extent that De Meo premised his breach of fiduciary duty cause of action on the allegation that Cooley owed him a duty *as his attorneys*, Cooley's summary judgment motion established that De Meo would not be able to prove the existence of such a duty.

> ## 2. *De Meo Has Not Identified Any Fiduciary Duty That Cooley Owed to Him as a Nonclient*

Next, De Meo contends that even if he and Cooley were not in an attorney-client relationship during the 2021 Transaction, Cooley nevertheless owed him a fiduciary duty during the 2017 Transaction and the 2021 Transaction due to certain rules that appear in the Rules of Professional Conduct.  Specifically, De Meo cites rule 1.13(f),[7] rule 4.1,[8] and rule 4.2.[9]

---

[7]     As we have noted, rule 1.13(f) provides, "In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing."  Rule 1.13 was adopted effective Nov. 1, 2018.  (See *Sprengel, supra*, 40 Cal.App.5th at p. 1042 & fn. 3.)  During the 2017 Transaction, rule 3-600(D) was in force. (See *Sprengel*, at p. 1042 & fn. 3.)  The parties agree that the provisions of the two rules are substantively identical for the purposes of this litigation.

[8]     Rule 4.1 states, "In the course of representing a client a lawyer shall not knowingly: [¶] (a) make a false statement of material fact or law to a third person; or [¶] (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Business and Professions Code section 6068, subdivision (e)(1) or rule 1.6."  (Asterisks and footnote omitted.)

[9]     The relevant portion of rule 4.2 is subdivision (a).  As we have noted, that provision states, "In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the

According to De Meo, those rules "set forth a lawyer's duties with respect to non-clients." De Meo argues that "because the purpose of the [Rules of Professional Conduct] is to protect 'the public,' and not only clients, there is no justification for limiting the scope of [the Rules of Professional Conduct] as establishing a fiduciary duty to clients only."[10]

De Meo does not cite any case law stating that a nonclient can sue an attorney for breach of fiduciary duty based on an attorney's failure to comply with the Rules of Professional Conduct that govern an attorney's conduct toward a nonclient. Instead, De Meo cites case law holding that a nonclient can pursue a claim for legal malpractice when the nonclient is *an intended third party beneficiary* of the legal work that the client retained the attorney to perform. " 'Although the lawyer's duty typically runs only to the client because that duty arises from the privity of contract that forms the lawyer-client relationship [citations], a lawyer can sometimes owe a duty to third parties who are the *intended beneficiaries* of the lawyer's legal work for the client, such as when the lawyer is retained by the client to draft a will, a testamentary trust, or an inter vivos trust or gift.' " (*Grossman v. Wakeman* (2024) 104 Cal.App.5th 1012, 1022–1023.) " '[T]he California courts have uniformly settled upon the following rule: A lawyer has a duty to a nonclient third party only if the client's intent to benefit that third party (in the way

matter, unless the lawyer has the consent of the other lawyer." (Rule 4.2(a), asterisks omitted.)

[10] Cooley argues that because De Meo did not refer to rules 4.1 or 4.2 in the Complaint, it "did not have the summary judgment burden to negate" a breach of fiduciary duty claim based on an alleged violations of those rules. Because we conclude, on other grounds, that the trial court properly granted summary judgment on the breach of fiduciary duty cause of action, we need not, and do not, address that argument.

the third party asserts in their malpractice claim) is "clear," "certain" and "undisputed." ' " (*Id.* at p. 1023.) "In other words, courts will recognize a duty to a nonclient plaintiff—and thereby allow that plaintiff to sue the lawyer for legal malpractice—only when the plaintiff, as a threshold matter, establishes that the client, in a clear, certain and undisputed manner, told the lawyer, 'Do *X*' (where *X* benefits the plaintiff)." (*Gordon v. Ervin Cohen & Jessup LLP* (2023) 88 Cal.App.5th 543, 556.)[11]

That case law is inapplicable here because De Meo does not argue that he was an intended third party beneficiary of Cooley's legal representation of ReTech or Rebotics. Instead, De Meo contends that, even in the absence of a third party beneficiary relationship, the Rules of Professional Conduct, standing alone, give rise to an attorney's fiduciary duty to a nonclient that can form the basis of a tort claim against the attorney by the nonclient. As we will explain, the contention lacks merit.

---

[11]   Apart from relying on case law arising in a third party beneficiary context, De Meo also quotes from *Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139 (*Tri-Growth*) to support his broad assertion that "courts have held that lawyers can owe duties to non-clients." Specifically, *Tri-Growth* stated that "an attorney's fiduciary duty can extend to *former clients*, to conduct *not strictly* pertaining to representation of a client, and to conduct with a nonclient which *affects the relationship with a client*." (*Id.* at p. 1151, italics added.) None of those circumstances are present here, and De Meo does not claim that they are. Further, the facts of *Tri-Growth* are inapposite. There the allegation was that a defendant attorney, who was a limited partner in the plaintiff partnership and had represented some of his copartners, had used the partnership's confidential information for his own benefit, against the interest of the partnership. (*Id.* at pp. 1145, 1146, 1151.) No such situation exists here.

"A violation of the Rules of Professional Conduct subjects an attorney to disciplinary proceedings, but does not in itself provide a basis for civil liability." (*BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227.) Indeed, as rule 1.0(b)(3) states, "A violation of a rule does not itself give rise to a cause of action for damages caused by failure to comply with the rule. Nothing in these rules . . . is intended to enlarge or to restrict the law regarding the liability of lawyers to others." (Rule 1.0(b)(3).) To be sure, the Rules of Professional Conduct help to " 'define the duty component of the fiduciary duty which the attorney owes *to his or her client.*' " (*BGJ Associates*, at p. 1227). But De Meo cites no authority to suggest that the Rules of Professional Conduct create an actionable fiduciary relationship between an attorney and a nonclient merely because they contain guidelines for how attorneys should conduct themselves toward nonclients. (Cf. *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658 [no cause of action arose based on the claim by plaintiff—a nonclient of the defendant attorney—that the attorney breached a fiduciary duty to her by violating the predecessor to rule 1.13, which stated that "[a] member of the State Bar shall not communicate with a party represented by counsel upon a subject of controversy, in the absence and without the consent of such counsel"].)

Accordingly, in the absence of an attorney-client relationship with Cooley, De Meo has identified no basis on which he can rely on rule 1.13(f), rule 4.1, and rule 4.2 of the Rules of Professional Conduct to establish the first element of a cause of action for breach of fiduciary duty, namely "the existence of a fiduciary relationship." (*Oasis West, supra*, 51 Cal.4th at p. 820.)

### 3. *The McIntyre Declaration Does Not Create a Triable Issue of Fact on the Breach of Fiduciary Duty Cause of Action*

To support his contention that Cooley owed him a fiduciary duty, De Meo also relies, in extremely general terms, on the McIntyre Declaration.

De Meo has not pointed us to any specific item in the McIntyre Declaration that he wants us to consider in support of his appeal. Instead, De Meo's opening appellate brief refers, sweepingly, to paragraphs 138 through 202 of the McIntyre Declaration and states, without elaboration, that "McIntyre's opinions demonstrate the existence and breach of fiduciary duty, along the same lines as the issues discussed" in the section of De Meo's brief that discusses the manner in which Cooley allegedly violated the Rules of Professional Conduct. We are not required to search the record to develop De Meo's arguments for him. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 ["The reviewing court is not required to develop the parties' arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived."].)

However, even if De Meo had identified any particular part of the McIntyre declaration that he wants us to consider, Cooley filed objections to large portions of the McIntyre Declaration, and the trial court sustained all of those objections.

De Meo contends that the trial court erred in sustaining Cooley's objections to the McIntyre Declaration. However, De Meo fails to develop the argument by directing us to any specific objections that he believes were improperly sustained. Instead, in a cursory argument, De Meo contends that the trial court erred, across the board, in sustaining *all* of Cooley's objections. De Meo's argument consists of two parts. First, without any citation to the record, De Meo states that none of the objections should have been sustained

because McIntyre "provide[d] detailed factual foundation . . . as well as detailed legal foundation." Second, De Meo cites case law, which he contends stands for the principle that "expert testimony is admissible to establish both the existence of a fiduciary duty and an attorney's breach of that duty," and he suggests, without any specific citation to the record, that the trial court failed to apply the "legal principle that ethics experts are permitted to opine on . . . whether a duty exists and whether [it was] breached."

"In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions [it] wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.) Cooley separately objected, over the course of 14 pages, to 22 different statements that appear in the McIntyre Declaration, giving multiple legal grounds for its objections to each of the 22 statements. De Meo does not specifically refer to any of those 22 statements or explain why, in context, Cooley's multiple legal grounds for objecting to any particular statement are without merit. Accordingly, De Meo has not sufficiently developed his argument with either legal argument or citation to the record.

In sum, De Meo has not established that anything appearing in the McIntyre Declaration requires us to reverse the trial court's grant of summary judgment on the breach of fiduciary duty cause of action.

30

C.    *Summary Judgment Was Properly Granted on the Fraudulent Concealment Cause of Action*

Finally, we consider De Meo's contention that the trial court erred in granting summary judgment on the fraudulent concealment cause of action.

As pled in the Complaint, the fraudulent concealment cause of action is based on Cooley's alleged failure to disclose to De Meo "the identity of [Cooley's] clients and the nature of [Cooley's] duties and obligations to that client and to De Meo" during the 2017 Transaction and the 2021 Transaction. According to the Complaint, Cooley had an obligation to make such a disclosure pursuant to rule 1.13(f) of the Rules of Professional Conduct, but Cooley "intentionally failed to disclose that information to De Meo." According to the Complaint, "but for the concealment, De Meo would have received proper legal advice, and would not have proceeded with the 2017 or 2021 transactions."

On appeal, as he did in opposition to the summary judgment motion, De Meo sets forth a completely different theory of fraudulent concealment from what he pled in the Complaint. De Meo argues that, during the 2021 Transaction, "Hallman Rice concealed from De Meo that the draft document she sent him was indeed a draft, subject to review and comment." De Meo alleges that, based on rule 4.1 of the Rules of Professional Conduct, Hallman Rice "had a duty not to conceal the information."

De Meo bases his contention on an email that Hallman Rice sent to an attorney for Symphony AI and a fellow Cooley attorney on October 16, 2021, prior to providing De Meo with one of the transaction documents. The email stated, "Can you please quickly advise if ok to send this revision to [De Meo]? Looking to send to him ASAP (we want to remove the draft language so that we are not inviting markups or making him think it is not really done yet)." De Meo interprets the email as suggesting that the documents Hallman Rice

31

later sent him were not in their final form, but that she concealed that fact.[12] On October 17, 2021, Hallman Rice told De Meo, "Yes [De Meo], you have everything and it is in final form. If anything changes, we will let you know, but I do not anticipate changes."

In granting summary judgment on the fraudulent concealment cause of action, the trial court ruled that because "there is no reference to" De Meo's new theory of fraudulent concealment "anywhere in the [Complaint]," the trial court would "not consider it." As we will explain, the trial court properly declined to consider De Meo's new theory of fraudulent concealment because it was not pled in the Complaint.

" 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] It necessarily follows that the pleadings frame the issues on a motion for summary judgment. '[T]he burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings.' " (*Ahn v. Stewart Title Guaranty Co.* (2023) 93 Cal.App.5th 168, 181–182.) " ' " ' "The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a

_____

[12]     We note that the email does not necessarily support De Meo's interpretation. Arguably, Hallman Rice's purpose for sending the email may have been to get sign off from Symphony AI's counsel on the final form of the document before sending it to De Meo. We note also that it is undisputed that regardless of whether Cooley concealed from De Meo that the deal documents were not in their final form, De Meo did eventually negotiate new terms with Symphony AI and thereafter informed Cooley that it should revise the deal documents accordingly.

substitute for an amendment to the pleadings." ' " ' . . . '[A] plaintiff wishing "to rely upon unpleaded theories to defeat summary judgment' must move to amend the complaint before the hearing.' " (*Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1275.)

Here, De Meo did not allege in the Complaint that Cooley committed fraudulent concealment regarding the status of the deal documents. Nevertheless, De Meo contends that he should have been permitted to rely on that theory of fraudulent concealment in opposing Cooley's summary judgment motion because "courts are encouraged to take a liberal approach in determining the scope of the pleadings.' " De Meo contends that all he was required to do is plead "ultimate facts," which could later be supplemented, during the summary judgment motion, with more specific facts. According to De Meo, the Complaint adequately pleads "ultimate facts" because it alleged "that Cooley committed fraud during the 2021 cause of action [*sic*]."

We reject the argument. Case law holds that, in the context of a summary judgment motion, "the courts may, in appropriate cases, evaluate the evidence presented as supplementing the bare bones of the pleading." (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 422.) However, even under that approach, the pleadings must "give fair notice to the opposing party of the theories on which relief is generally being sought." (*Ibid.*) This is because a moving party cannot be expected to " 'refute liability on some theoretical possibility not included in the pleadings.' " (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) De Meo points to nothing in the Complaint that would have given Cooley fair notice that he intended to pursue a fraudulent concealment claim based on the theory that Hallman Rice concealed that the deal documents

provided to him were not in their final form during the 2021 Transaction. Those facts were not mentioned anywhere in the Complaint.

More importantly, the fraudulent concealment cause of action very clearly alleges that it is based on a *completely different* theory, namely, that Cooley failed to disclose, during both the 2017 Transaction and the 2021 Transaction, "the identity of [Cooley's] clients and the nature of [Cooley's] duties and obligations to that client and to De Meo." The facts that were *actually pled* in the fraudulent concealment cause of action are of heightened significance in light of the rule that, as a species of fraud, a claim for fraudulent concealment must be pled with specificity. (*Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 43.) Based on that pleading requirement, Cooley was especially justified in assuming, when preparing its motion for summary judgment, that the facts set forth with specificity in the fraudulent concealment cause of action represented the theory upon which De Meo was proceeding.

Cooley cannot be expected to have directed its summary judgment motion to a theory of fraudulent concealment that was never even hinted at in the Complaint, and that has no factual overlap with the theory *that was actually pled*. If De Meo wished to rely on a different theory of fraudulent concealment from the theory pled in the Complaint, he was required to ask for leave to amend the Complaint so that Cooley could bring a new summary judgment motion targeted at the updated theory. (*Huntsman-West Foundation v. Smith* (2024) 104 Cal.App.5th 1117, 1133 ["If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion."].)

34

Accordingly, because the Complaint did not give fair notice of a fraudulent concealment theory premised on Hallman Rice's statements about whether the deal documents provided to De Meo were in their final form, we reject any attempt by De Meo to rely on that theory in opposition to Cooley's motion for summary judgment. De Meo asserts no other appellate argument regarding the fraudulent concealment cause of action. Accordingly, he has failed to carry his burden to establish that the trial court erred in granting summary judgment on his claim for fraudulent concealment.[13]

---

[13] We need not, and do not, consider Cooley's argument that summary judgment was also warranted based on the release that De Meo signed in connection the 2021 Transaction.

DISPOSITION

The judgment is affirmed.  Cooley shall recover its costs on appeal.


                                                            IRION, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

36

Filed 10/8/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GIOVANNI DE MEO, | D084269 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2022-00022799-CU-PN-CTL) |
| COOLEY LLP, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed September 15, 2025, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

IT IS ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

MCCONNELL, P. J.

Copies to:  All parties

2